GIANT POWDER COMPANY *v.* CALIFORNIA VIGORIT POWDER COMPANY and others.

(*Circuit Court, D. California.*  ———, 1880.)

1. RE-ISSUE—REV. ST. § 4916.—Section 4916 of the Revised Statutes only authorizes a re-issue when, from an unintentional error in the desription of the invention, the patent is invalid or inoperative, or when the claim of the patentee exceeds his invention.

2. SAME—COMMISSIONER OF PATENTS—JURISDICTION.—The power to accept a surrender and issue new letters is vested exclusively in the commissioner of patents, and his decision in such cases is not open to collateral attack in a suit for the infringement of re-issued letters.

3. SAME—SAME—SAME.—The commissioner of patents, however, is an officer of limited authority, whose jurisdiction is restricted to the particular cases mentioned in the statute, and, therefore, whenever it is apparent upon inspection of the patents that he has acted without authority, or has exceeded it, his judgment must necessarily be regarded as invalid.

4. SAME—SAME—SAME.—*Held*, therefore, where an original patent covered a compound of nitro-glycerine with inexplosive, porous, absorbent substances, and the re-issued patent covered a compound of nitro-glycerine with all porous absorbents, whether explosive or inexplosive, that there was no case presented upon which the powers of the commissioner of patents could be invoked, and that the re-issue was therefore void.

*Russell* v. *Dodge*, 93 U. S. 463.

5. PATENT—TERMS—CONSTRUCTION.—Although the court cannot look outside of a patent for the explanation of terms in it which are not technical and are free from ambiguity, yet it can examine into the history of the invention patented so as to be able to read the specifications in the light of the inventor's knowledge.

6. SAME—SAME—SAME.—*Held*, therefore, in view of the history of this case, and reading the specifications of the patent in that light, that it is clear that the inventor used the term " inexplosive " in its natural and ordinary sense, and that the attempt to limit that meaning is an afterthought of the assignees, desiring to bring within the reach of the patent compounds in no respect within the inventor's contemplation.

*McAllister & Bergin, Alfred Rix,* and *Causten Browne,* for complainant.

*Hammond & Wright,* for defendants.

FIELD, C. J.   The complainant is the holder of a patent bearing date March 17, 1874, for an alleged new explosive compound known as dynamite or giant powder.   For some time since its issue the defendants have been engaged in making, selling, and using an explosive compound averred to be substantially the same as the compound described in the patent.   This suit is brought for the alleged infringement, with a prayer that the defendants be required to account and pay over to the complainant the income and profits obtained by them from this violation of its rights, and be restrained from further infringement.   The compound patented is claimed to be the invention of Alfred Noble, a distinguished engineer of Sweden.   His invention, whatever may have been its extent, was assigned to one Bandmann, in April, 1868, and in May

following a patent for the same was issued to him for the term of 17 years. Soon afterwards Bandmann assigned his interest to the complainant, the Giant Powder Company, a corporation created under the laws of California; and in October, 1873, this company surrendered the patent and obtained re-issued letters for the residue of the term. In March, 1874, this re-issue was also surrendered, and new letters patent were issued, for the infringement of which the present suit is brought. The bill alleges that the surrender of the original letters, the first re-issue, its surrender, and the second re-issue were each made for "good and lawful cause;" but it does not specify what that cause was. The allegation will, however, be taken to be that the cause was one for which the statute authorized a surrender and a re-issue. The bill also alleges that each re-issue was for the same invention described in the original patent.

The answer denies both of these allegations, and avers that the original letters and the first re-issue were not surrendered because they were invalid by reason of a defective and insufficient specification arising from inadvertence, accident, or mistake, without any fraudulent intention on the part of the patentees, and charges that they were surrendered upon false representations, with the intent to interpolate and obtain, in re-issued letters, claims and grants for more than was embraced by the invention of Nobel described in the original patent, and that the re-issued letters were not for the same invention, but for another and different one. And the defendants insist that for this and other reasons the re-issued letters are invalid.

On the argument the counsel of the complainant stated that the second re-issue was obtained to correct a clerical error in the description of the grantee, and that it does not differ in its specifications from the first re-issue, so that practically there is but one re-issue in the case. So treating the matter, the question presented to us at the outset relates to the validity of this re-issue.

The act of congress of 1870, embodied in the Revised Statutes, (under which the re-issue was granted,) provides that

"whenever any patent is inoperative or invalid, by reason of a defective or insufficient specification, or by reason of the patentee claiming as his own invention or discovery more than he had a right to claim as new, if the error has arisen by inadvertence, accident, or mistake, and without any fraudulent or deceptive intention, the commissioner shall, on the surrender of such patent and the payment of the duty required by law, cause a new patent for the same invention, and in accordance with the corrected specification, to be issued to the patentee, or in case of his death, or of an assignment of the whole or any undivided part of the original patent, then to his executors, administrators, or assigns, for the unexpired part of the term of the original patent. Such surrender shall take effect upon the issue of the amended patent."

As thus seen, a re-issue can only be had when the original patent is inoperate or invalid from one of two causes—either by reason of a defective or insufficient specification, or by reason of the patentee claiming as his own invention or discovery more than he had a right to claim as new; and even then the patentee can only obtain a re-issue where the error has arisen from inadvertence, accident, or mistake, and without any fraudulent or deceptive intention.

As the power to accept a surrender and issue new letters is vested exclusively in the commissioner of patents, his decision in the matter is not open to collateral attack in a suit for the infringement of re-issued letters. His action, like that of all officers especially designated to perform a particular duty of a judical character for the government, is presumed to be correct until impeached by regular proceedings to annul or modify it. He must judge, in the first instance, of the sufficiency of the original specification—whether the same is defective in any particular; whether such defect was the result of an unintentional error; and, if so, to what extent a new or additional specification should be allowed to describe correctly the invention claimed; and it is to be assumed in every case that he has done his duty. The decisions of the supreme court to this effect are numerous, and the doctrine is among the settled rules of patent law. But it does not preclude the

examination of the original and re-issued patents, to see whether or not they disclose on their face a case in which the commissioner had authority to act, or whether he has exceeded his authority in issuing letters for an invention different from that described in the original patent. If they disclose a case in which the commissioner had no jurisdiction to act, or a case in which by his determination he has exceeded his jurisdiction, the re-issued letters must fall. His determination can have no greater conclusiveness than that of the judgment of a regular judicial tribunal; and we all know that although such judgment cannot be collaterally attacked by showing that the evidence upon which the court acted was insufficient, that improper testimony was admitted, that the court erred in its rulings upon matters of law, or that the verdict of the jury was against the weight of evidence, yet the record of the judgment can in all cases be examined to see whether the court has jurisdiction of the subject-matter and of the person of the defendant; and, if such jurisdiction be wanting, the judgment is ineffectual for any purpose. So here, upon all matters outside of the patents which the commissioner was to hear, and upon the weight of which he was to determine, his judgment is conclusive in the present suit; but if the patents disclose a case in which he had no jurisdiction, or in which he exceeded it, his determination carries with it no efficacy.

This is general and universal law, although we find expressions in opinions that the only question left over for the consideration of the court, in a suit for infringement of re-issued letters, is whether the new and the old patent are for the same invention. The expressions would be more accurate if they were; that seldom could any other question be raised, for seldom will it appear without the consideration of extrinsic evidence whether or not the original patent was invalid or inoperative from a defect of specifications. Suppose, for illustration, that the specifications in two patents, the original and the re-issued, were identical in their language—or, differing in phraseology, were identical in meaning—would it be pretended that, though their identity would be thus manifest on their face from a comparison of the two, and that the com-

missioner in granting the re-issue had accordingly acted in a case not warranted by the statute, it must be assumed that the re-issue was properly granted, and that the action of the commissioner could not therefore be questioned? The decisions support no such conclusion.

The commissioner is an officer of limited authority; and, whenever it is apparent upon inspection of the patents that he has acted without authority, or has exceeded it, his judgment must necessarily be regarded as invalid. His action must be restricted to the particular cases mentioned in the statute. That only authorizes a re-issue when, from an unintentional error in the description of the invention, the patent is invalid or inoperative, or when the claim of the patentee exceeds his invention. It is not sufficient that the patent does not cover all that the patentee could have claimed if his specifications had come up to his invention. If he has invented or discovered something beyond his original specifications and claim, his course is not to endeavor to cover it by a re-issue, but to seek a separate patent for it.

The statute authorizing a re-issue was intended to protect against accidents and mistakes, and it is only when thus restricted that it can be regarded as a beneficial statute. If a patentee does not embrace by his specifications and claim all that he might have done, and there has been no clear mistake, inadvertence, or accident in their preparation, the presumption of law is that he has abandoned to the use of the public everything outside of them, or at least has postponed any additional claim for further consideration.

In *Russell* v. *Dodge*, 93 U. S. 463, the supreme court, speaking of a re-issue under the law of 1836, which is similar to the law of 1870, under which the present re-issued letters were obtained, said: "A defective specification could be rendered more definite and certain so as to embrace the claim made, or the claim could be so modified as to correspond with the specification; but except under special circumstances, such as occurred in the case of *Lockwood* v. *Morey*, 8 Wall. 230, where the inventor was induced to limit his claim by the mistake of the commissioner of patents, this was the extent to

which the operation of the original patent could be changed by the re-issue. The object of the law was to enable patentees to remedy accidental mistakes, and the law was perverted when any other end was secured by the re-issue." See, also, *Railway* v. *Sayles,* 97 U. S. 563.

In the light of this decision, and of the views expressed upon the act of congress, there can be but one answer to the question presented as to the validity of the re-issue upon which this suit is founded. Looking at the original patent and the re-issued patent, and the specifications annexed to them, we find that the material difference between them is as to the extent of the invention. The original patent covers a compound of nitro-glycerine and any inexplosive porous absorbent which will take up the nitro-glycerine and render it safe for transportation, storage, and use, without loss of its explosive power. The re-issued patent enlarges the scope of the invention so as to embrace a compound of nitro-glycerine with any porous substance, explosive or inexplosive, and will be equally safe for use, transportation, or storage.

It is plain, from a comparison of the specifications of the two patents, that their difference is in their application—the one covering only a compound of nitro-glycerine with inexplosive, porous, absorbent substances; the other covering a compound of nitro-glycerine with all porous absorbents, whether explosive or inexplosive. We shall hereafter consider how far this changes the character of the invention. At present it is sufficient to say that it is manifest that if the re-issued patent, standing alone, would be valid and operative, the original patent, to the extent of its claim, would be valid and operative also; in other words, that there is no foundation for the pretence that the original patent was invalid or inoperative from any defect of description. Its range or scope was more limited than the re-issued patent—that is all. It was a valid and operative patent to the extent of its claim, and that covered the invention described. There was, therefore, no case presented upon which the powers of the commissioner could be invoked. There was no invalid or inoperative patent, from a defect of description, to be corrected by a re-

issue. The specifications annexed to the original patent were clear and sufficiently explicit for the compound composed of nitro-glycerine and the inexplosive, porous substance mentioned, and the claim was only for a composition of matter made of the ingredients in the manner and for the purposes described in them. There was, therefore, nothing to correct in a re-issue, according to the decision in *Russell* v. *Dodge*, 93 U. S. 463. The claim was as extensive as the invention specified, and there is no pretence that this was not sufficient to cover a compound of nitro-glycerine with inexplosive, porous absorbents.

The case might be rested here; but respect for the able and distinguished judges of the first and second circuits requires some notice of their decisions. They have held that the re-issued patent is valid, against a defence that it covers a different invention from that described in the original patent, and that the term "inexplosive," in the original specifications, is used only in a relative sense, as compared with nitro-glycerine, and not in an absolute sense, excluding the entire use of all explosive absorbents, whatever their degree of explosiveness. Their attention does not, however, appear to have been directed to the point, that if the original patent was valid and operative with the existing specifications, there was no case for a re-issue for the consideration of the commissioner. On the contrary, their opinions, like the argument of counsel in the case, go to show that the original patent was valid and operative, and that its specifications were sufficiently comprehensive to include explosive absorbents, if the resulting compound could be safely used, stored, and transported. If their positions be sound, there was no ground for a re-issue, and the new letters cannot be sustained.

But, independently of this consideration, we are not able to concur with the learned judges as to their interpretation of the term "inexplosive" in the original patent, and consequent judgment that the re-issued patent is for the same invention. While we cannot look outside of the patent for the explanation of terms in it which are not technical and are free from

ambiguity, we can examine into the history of the invention patented, so as to be able to read the specifications in the light of the inventor's knowledge. We can place ourselves in his position so as to see, as it were, with his eyes, and speak with his language. The natural signification of the term "inexplosive" would exclude explosive absorbents; and, where an attempt is made to qualify and limit this meaning, we are at liberty to inquire into the circumstances under which the term was used. It was held by the supreme court of California, in construing an agreement concerning the boundary line of mining claims, where the term "north" was used, that it was competent to show by the usage of the place that it had reference to the line indicated by the compass there, and not to a line due north and south, according to the true meridian. *Jenny Lind* v. *Bower*, 11 Cal. 194.

Now, reading the history of the labors of Alfred Nobel to utilize the explosive power of nitro-glycerine and render it safe to transport, handle, and use; the experiments he tried, first to explode the nitro-glycerine in mass, then, in consequence of the dangers attending its use, to prevent its explosion when handled; the patents he obtained in Europe; his experience in the use of gunpowder and other explosives with nitro-glycerine,—it is impossible to believe that he intended anything different from the natural meaning of the term he used. He knew well the danger attending the use of nitro-glycerine with explosive absorbents; and, in limiting his claim to its use with inexplosive absorbents, we must presume that he at that time intended to abandon all claim to compounds of a different character, or at least to leave such claim open for further consideration. If we read his own language, in an application made three years afterwards for a new patent for a compound with explosive absorbents, presented to the commissioner of patents by the complainant, and therefore adopted and approved by it, there can be but little doubt on the subject. Soon after the new patent was obtained the application for a re-issue was made, evidently that it might reach back to the date of the original patent and cover inven-

tions of other parties during the intermediate period, or that which had gone into public use.

We do not attach to the general language used by Nobel in the first patent, following the statement of the nature of his invention, the significance ascribed to it by counsel. We give it a different construction. The statement is that "the nature of the invention consists in forming out of two ingredients long known, viz., the explosive substance nitro-glycerine, and an inexplosive porous substance hereinafter specified, a composition which, without losing the great explosive power of nitro-glycerine, is very much altered as to its explosive and other properties, being far more safe and convenient for transportation, storage, and use than nitro-glycerine."

Following this statement is this language: "In general terms my invention consists in mixing with nitro-glycerine a substance which possesses a very great absorbent capacity, and which at the same time is free from any quality which will decompose, destroy, or injure the nitro-glycerine or its explosiveness." The substance here mentioned as possessing a great absorbent capacity has reference not to any absorbent substance, but that which is specifically designated in the preceding statement of the ingredients of the compound, as if the inventor had said: "In general terms, my invention consists in mixing with nitro-glycerine a substance which possesses a very great absorbent capacity, which substance is porous and inexplosive, and is hereinafter specified." The inexplosive porous substances afterwards specified were certain kinds of silicious earth, or silicic acid, known under the general term of silicious marl, tripoli, rotten stone, and the like, the best of which was composed of the remains of *infusoria*.

This construction renders it unnecessary to give a forced meaning to the term "inexplosive," and is consistent with all the preceding and subsequent statements and conduct of the inventor as disclosed in the history of his invention. It nowhere appears that he had any knowledge or belief, when the first patent was issued, that the admixture of nitro-glycerine with explosive substances would produce a safety powder. That was a discovery which he did not make, or claim to have

made. So when in his specifications he mentions charcoal as an absorbent, he observes that it has the "defect of being itself a combustible material."

To our mind, looking at the history of the invention and reading the specifications of the patent in this light, it is clear that the inventor used the word "inexplosive" in its natural and ordinary sense, and that the attempt to limit that meaning is an afterthought of his assignees, desiring to bring within the reach of the patent compounds in no respect within his contemplation. In other words, the re-issued letters cover a compound not claimed by Nobel, and not embraced in the original patent.

It follows that in our judgment the complainant has no just clause of complaint against the defendants, and its suit must be dismissed, with costs, and it is so ordered.

NOTE. See *Atlantic Giant Powder Co.* v. *Dittmar Powder Co.* 1 FED. REP. 328, and *Dittmar* v. *Rix*, Id. 342.

