# IN RE APPLICATION OF NEILL.

PATENT OFFICE PRACTICE; APPELLATE PRACTICE; INTERFERENCES; ANTICIPATION.

1. The practice of the Patent Office is not a matter for regulation by this court; and irregularities therein, even if patent on the record, will only be considered by this court when some substantial right of a party has been denied and the point saved for presentation on appeal.

2. Where appellant claimed that patents were wrongly granted to E., and that after he had adopted E.'s claims his application should have been placed in interference with E., *held* that whether the grant of E.'s patent was right or wrong or capable of satisfactory explanation, and whether an interference should be declared, are matters not within the jurisdiction of this court.

3. If this court had a right to inquire into the propriety of the issue of the patents to E., and it was plain that an error had been committed therein, that would not excuse a similar error in favor of the appellant in order that he might be put in interference with him.

4. After examination of the patents cited as references against

appellant's claim, *held*, that, considered together, they constitute complete anticipation of the process claimed to have been discovered by appellant, and the decision of the Patent Office *affirmed*.

No. 73. Patent Appeals. Submitted November 9, 1897. Decided December 8, 1897.

HEARING on an apppeal from a decision of the Commissioner of Patents refusing an application for a patent. *Affirmed*.

The facts are sufficiently stated in the opinion.

*Mr. James B. Rogers* for the appellant.

*Mr. W. A. Megrath* for the Commissioner of Patents.

Mr. Justice SHEPARD delivered the opinion of the Court:

1. This is an appeal from the decision of the Commissioner of Patents refusing an application of James W. Neill, filed January 13, 1890, for the patent of a method of concentrating pyritiferous ores.

The following are the claims that were rejected:

"1. The process of rendering magnetic nonmagnetic ores of the class specified and then separating such magnetic ores from the gangue or other associated metals or minerals, which consists in first crushing as near as may be the mined or cold ore to a uniform condition of granulation or pulverization, then heating the crushed ore to such temperature as to render the nonmagnetic pyrites magnetic and then magnetically separating the latter from the ore or gangue, substantially as set forth.

"2. The process of separating nonmagnetic pyritiferous ores from gangue or associated metals or minerals, which consists in first approximately reducing the ore to a uniform pulverization or granulation, then heating it to convert the nonmagnetic pyritiferous particles to magnetic particles, and then magnetically separating the latter from the ore or gangue, substantially as set forth.

"3. The process of separating nonmagnetic ores from their

gangue or associated metals or minerals which consists in reducing all the ore to an approximately uniform degree of granulation or pulverization, then drying the same, then heating to convert the nonmagnetic particles to magnetic particles and then magnetically separating the latter from the gangue, substantially as set forth.

"4. The method of concentrating chalcopyrite ores by eliminating magnetically any magnetic material therein while the copper and iron pyrites are nonmagnetic, and then heating the remainder to such a temperature as to render the chalcopyrite magnetic and separating the reduced chalcopyrites magnetically, substantially as set forth.

"5. The method of concentrating chalcopyrite ores, which consists in crushing the ore to disengage the chalcopyrites, iron pyrites, earthy gangue, and magnetic pyrites, magnetically separating the magnetic pyrites, heating the residue, thereby rendering the chalcopyrite magnetic, and magnetically separating the same, substantially as set forth.

"6. The process of separating pulverized chalcopyrite and iron pyrites or other materials which are rendered magnetic by heat from other nonmagnetic material, which consists in heating the mass sufficiently to render the chalcopyrite magnetic and magnetically separating the same, then heating the residue to a higher temperature and magnetically separating the iron pyrites, substantially as described.

"7. The method of obtaining copper and other valuable constituents of chalcopyrite ore, which consists in first concentrating the whole by vanning or otherwise, separating the naturally magnetic material magnetically, then heating the remainder to a temperature sufficient to render the chalcopyrite magnetic and insufficient to render the iron pyrites magnetic, separating the magnetic chalcopyrite magnetically, then reheating the remainder to a much higher temperatue to render the iron pyrites magnetic, and separating the same magnetically, leaving the gold, silver, lead, &c., as a final nonmagnetic residue, substantially as described.

"8. The process of separating magnetic oxide of iron from magnetic pyrites where both occur in the same ore, consisting in subjecting the crushed material to magnetic action of such strength that, due to the difference in specific magnetic capacity of the oxide of iron and the pyrites, the oxide of iron particles will be acted upon, while the magnetic particles will not be acted upon, substantially as set forth.

"9. The process of treating ores containing magnetic oxide of iron and magnetic pyrites, consisting in first crushing the ore, then passing it through a magnetic separator of sufficient strength to separate the entire magnetic materal from the nonmagnetic gangue, and then passing the concentrated ore through a magnetic separator of such strength that, due to the difference in specific magnetic capacity of the oxide of iron and the pyrites, the oxide of iron particles will be separated from the pyrites particles, substantially as set forth.

"10. The process of separating nickeliferous from nonnickeliferous pyrrhotite where both occur in the same ore, consisting in subjecting the crushed material to a magnetic action of such strength that, due to the difference in magnetic capacity of the nickeliferous and nonnickeliferous pyrrhotite, the nonnickeliferous pyrrhotite will be acted upon magnetically, while the nickeliferous pyrrhotite will not be thus acted upon, substantially as set forth.

"11. The process of treating ores containing nickeliferous and nonnickeliferous pyrrhotite, consisting in first crushing the ore to free the particles of pyrites from the gangue and other metals, passing the material through a magnetic separator of a sufficient strength to withdraw all the magnetic pyrites and then passing the magnetic pyrites through another separator having a sufficient strength to act upon the nonnickeliferous pyrrhotite, but not upon the nickeliferous pyrrhotite, substantially as set forth."

Of the foregoing, the two first claims, with unimportant

modifications, are to be found in the original application. The third claim, which the application was amended so as to embrace, adds the process of drying the ores, when necessary, after pulverization, before heating them for the purpose of the electrical separation.

The eight remaining claims purport to be copies of the claims in certain patents issued to Thomas A. Edison upon applications filed subsequent to that of Neill, and were added without further amendment of the specifications of the application.

2. Seventeen errors have been assigned in the reasons for appeal, many of which, relating to matters of practice in the Patent Office, we do not feel called upon to consider. The practice of that office is not a matter for our regulation, and irregularities therein, even if patent on the record, would only be considered when some substantial right of a party has been denied, and the point has been saved for presentation on appeal.

3. The decision of each of the three tribunals of the Patent Office has been against the applicant on the ground that there is no patentable novelty in the first two of his claims, and each has considered the remainder of the claims to involve substantial departures from the invention described and claimed in the original application, under the rule laid down in *Railway Co.* v. *Sayles*, 97 U. S. 554, 563, and other cases cited.

In so far as the second point of the decisions above referred to applies to those parts of claims No. 4 to No. 11, inclusive, which indicate processes of electrical concentration and separation of pyritiferous ores without a preliminary heating process at all, we think it has been correctly decided. But to concede that, in so far as they may relate to a process of heating the said ores preliminary to electrical separation, it was error to exclude them from consideration, would not substantially affect the merits of the appeal as they appear to us on the whole record.

4. After careful examination of the specifications and claims of the patents cited as references, we are compelled to agree with the tribunals of the Patent Office, that, considered together, they constitute complete anticipation of the process claimed to have been discovered by the appellant. He of course does not claim to have discovered the process of electrical separation. It is in certain steps in connection therewith that invention is claimed. As the references aforesaid are matters of record, and have been discussed in the decisions appealed from, we shall not consume time with their review in detail. It is enough to say that in one of them at least—the patent to John R. Francis of May 23, 1873—the process of roasting—that is to say, drying the ores after pulverization and before heating, as set out in appellant's claim No. 3—is distinctly claimed.

Several references show processes for pulverizing and then heating pyritiferous ores in a furnace to a sufficient degree to drive off a part of the sulphur contained therein and render them fit for the final process of electrical separation or concentration. The contention on behalf of the appellant is, that there is a substantial difference between the processes of other patentees and his own in the fact that they introduce certain reducing agencies in the act of heating—such as charcoal, hydrocarbon gases, superheated steam, and the like—the effect of which is to convert the sulphides of iron and copper into the oxides thereof, and in support of the contention he refers to their specifications and offers a statement from his own, as amended, in comparison therewith.

After stating the details of his process of crushing and heating, and contrasting it, in point of time and fuel saved, with the processes of heating in kilns, piles, or heaps, he says:

"If heating in piles, kilns or heaps be attempted on ores containing pyrites, the reaction can not be controlled at all, and either a large part of the pyrites would remain un-

changed or it would be converted into a nonmagnetic state, as oxide, and thus the object of much heating would be frustrated. . . . By my process it is obvious that non-magnetic pyritiferous ores, of all kinds, can be more effectually and economically treated than can be done by processes involving kiln, heap or pile heating, roasting, or oxidizing of such ores."

The foregoing, and the contention which it is cited to support, are not in perfect accord, it may be remarked, with the declaration in the specifications, as filed with the original application, that—

"I am well aware it has long been known that heating iron pyrites in closed vessels, or upon charcoal, converts the same into a magnetic iron sulphide; but so far as I know it has never been proposed to separate the iron sulphide from the gangue or other material in the ore by the preliminary action of heat and the subsequent application of magnetism for purposes of concentration. I have found it not necessary to used closed vessels or charcoal in connection with the heating to convert the iron pyrites into iron sulphide, but that the iron pyrites by heating in any manner to the necessary degree and for the requisite length of time is converted into a strongly magnetic iron sulphide, and then can be separated easily and quickly and cleanly, by magnetism, from its gangue or other associated material."

Now, if the facts were in entire support of the broad contention as made, we are not prepared to say that there might not be a patentable difference between the two processes. See *In re Musgrave*, 10 App. D. C. 164, and cases cited therein. We need not, however, go further into that inquiry, because it is rendered wholly unnecessary and irrelevant by the distinct specifications, and claims of at least one of the references—namely, the English patent of Frederick John King, granted January 23, 1874. He says:

"This invention relates to effecting the separation of ores or of natural mineral substances, which, by the application

of heat or by the application of heat together with a reducing agent, are capable of being rendered magnetic, or capable of being attracted by means of a magnet or magnets, and thereby being capable, by means of such agency, of being separated from nonmagnetic and other impurities."

And his first claim is:

"In submitting ores or other similar natural mineral products containing sulphur, such, for example, as iron pyrites or minerals containing the same, which, upon being subjected to the action of heat either in a closed or in a partially closed vessel, the sulphide of iron shall be rendered magnetic, or capable of being attracted by means of a magnet or magnets."

The second claim relates to the "higher oxides of iron" and their heating "in conjunction with a reducing agent, such, for example, as charcoal," for the purpose of the electrical separation.

5. The complaint of the appellant that patents were wrongly granted to Thomas A. Edison, and that, especially after the adoption of eight of the Edison claims by him, his application was not placed in interference with the said patents to Edison, can not be considered. Whether the grant of the Edison patents upon those claims, in whole or in part, was right or wrong, or capable of satisfactory explanation, in the light of the opposition made to the application of the appellant, or of the references aforesaid, are matters not within our jurisdiction. As a necessary preliminary to the declaration of an interference, the invention claimed must first have been declared patentable. As the decision of that question was against him, and correctly so, he is in no position, here at least, to complain that Edison has received something to which he had an earlier and better claim.

If we had a right to inquire into the propriety of the issue of the patents to Edison, and it was plain that an error had been committed therein, that would not excuse a

similar error in favor of the appellant, in order that he might be put in interference with him. There are other ways for the correction of such errors.

Finding no error in the decision of the Assistant Commissioner of Patents, the same is affirmed, and this decision will be certified to the Commissioner of Patents. It is so ordered.                                    *Affirmed.*