UNION SPECIAL MACH. CO. v. METROPOLITAN SEWING MACH. CORPORATION.

(District Court, D. Delaware. December 31, 1921.)

No. 362.

1. **Patents ⚙⟶328—1,123,576, for sewing machine, held not infringed.**
   The Onderdonk patent, No. 1,123,576 for power sewing machine mechanism, claim 16, *held* not anticipated and valid, but not infringed by a machine made in accordance with the Weis & Weis patent, No. 1,230,355. Claims 14, 15, and 17, *held* invalid.

2. **Patents ⚙⟶109—When supplemental oath not required for additional claims.**
   Where claims added to an application, or transferred from another application, are within the original specification and drawings, no supplemental oath is required.

3. **Patents ⚙⟶328—1,230,355, for sewing machine, claim 29, held valid, but not infringed.**
   The Weis & Weis patent, No. 1,230,355, for power sewing machine mechanism, claim 29, *held* not anticipated and valid but not infringed.

4. **Patents ⚙⟶328—1,025,552, 1,155,533, and 1,155,534, for trimming mechanism for sewing machines, held not infringed.**
   The Weis patents, No. 1,025,552, No. 1,155,533, and No. 1,155,534, for trimming mechanism for sewing machines, *held* not infringed.

5. **Patents ⚙⟶328—1,026,839, for mechanism for sewing machines, held void for anticipation.**
   The Weis patent, No. 1,026,839, for mechanism for sewing machines, *held* void for anticipation.

In Equity. Suit by the Union Special Machine Company against the Metropolitan Sewing Machine Corporation, with counterclaim by defendant. Bill and counterclaim both dismissed.

Fraley & Paul, of Philadelphia, Pa., and Sturtevant & Mason, of Washington, D. C., for plaintiff.

Edward S. Beach, of New York City, for defendant.

MORRIS, District Judge. This is a suit in equity on final hearing for infringement of letters patent relating to sewing machines. The plaintiff, Union Special Machine Company, charges the defendant, Metropolitan Sewing Machine Corporation, with infringement of letters patent No. 1,123,576, issued to plaintiff January 5, 1915, as assignee of Lansing Onderdonk, upon an application filed August 29, 1904. The answer of the defendant sets up the defenses of invalidity and noninfringement, and by way of counterclaim alleges infringement by the plaintiff of 12 letters patent owned by the defendant, as to 7 of which the charge of infringement has been abandoned. Those now relied upon are No. 1,230,355, dated June 19, 1917, to J. P. and A. H. Weis; No. 1,026,839, dated May 21, 1912, to J. P. Weis; No. 1,025,552, dated May 7, 1912, to J. P. Weis; No. 1,155,533, dated October 5,

⚙⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

1915, to J. P. Weis; No. 1,155,534, dated October 5, 1915, to J. P. Weis. The answer of plaintiff to the defendant's counterclaim also raises the defenses of invalidity and noninfringement as to each of the letters patent sued upon by the defendant.

[1] The art in question involves high-speed power sewing machines for use for manufacturing purposes in hosiery and underwear mills, and in skirt, overall, clothing, and similar factories. The branch of that art with which we are here first concerned is that pertaining to the mechanism for making what is commonly termed the Grover & Baker, or double-thread, looped or chain stitch. In making this stitch two threads are in concatenation. The upper, or needle thread, runs over the top of the fabric, and at each descent of the needle is driven through the fabric in the form of a loop. It is, of course, necessary that the thread thus driven through the fabric should not be wholly withdrawn with the needle. In the stitch in question such withdrawal is prevented by a looper carrying the under or looper thread. The looper is a reciprocating arm and blade located beneath the work plate over which the fabric passes. The blade is at the upper end of the arm and has an eye near its forward end or point, through which the looper thread reeves. The blade operates substantially at right angles to the needle. When the machine is put in operation, the needle descends, passes through the fabric, and begins to rise. The advancing threaded looper blade then passes between the needle and the needle thread, and the latter is thus held beneath the fabric, although the needle rises above it. The looper blade, but not its thread, must, however, be withdrawn from the needle loop. To prevent the withdrawal of the looper thread from the needle loop with the looper blade, the needle in its next descent passes between the looper thread and blade at a point between the eye of the looper and the needle thread loop then encircling the blade. The looper thread is thereby retained, while the looper blade by a retrograde movement withdraws from the needle thread loop and leaves within the latter a double looper thread or loop. The cycle of stitch forming events then begins anew.

The result is that each needle thread loop passes through each looper thread loop, and is in turn passed through by the succeeding loop of the looper thread. Each thread is thereby anchored and retained in its proper position. This stitch is old. It has been known and made for much more than a half century. Grover & Baker Sewing Machine Co. v. Williams, Fed. Cas. No. 5,847. Early mechanism by which it was made is shown in the Grover patent, No. 33,778, of 1861, and the stitch is well illustrated in the patent to Bigelow, No. 365,665. Little difficulty, comparatively speaking, seems to have been experienced in passing the blade of the looper into the needle thread loop. This was due, at least in part, to the fact that the thread is pressed by the needle tightly against the surrounding fabric. The thread is thereby prevented from rising with the rapidity of the needle. Since the bottom of the loop passes through the eye of the needle, the more rapid ascent of the needle causes the thread to bow out from the sides of the needle, and leave an opening between the thread and the needle that may be easily entered by the looper. The looper blade, however, does not pass

through the fabric. Its thread is, therefore, not retarded and bowed by the fabric during the retrograde movement of the blade, as is the needle thread in the upward movement of the needle. Hence the more difficult problem has been to find means to cause the looper thread to be pulled or bowed out from the looper blade, and both to be so positioned just after the point of the needle at each descent passes through the work plate that the needle in its continued descent will invariably pass between the looper blade and the looper thread, and thus prevent the missing of stitches.

It was with this problem, particularly as applied to multiple needle machines, that Onderdonk in patent No. 1,123,576, here sued upon by the plaintiff, was dealing. Onderdonk's scheme as set out in claim 16 (the one mainly relied upon) of that patent is:

"A combination of a feeding mechanism, of a plurality of needles arranged in a line substantially at right angles to the line of feed, a thread carrying looper co-operating with each needle, means for moving said loopers into and out of their respective needle loops, each looper moving into the needle loop in a direction opposed to the direction of feed and in a line substantially parallel with the line of feed, means for moving the loopers laterally while in the needle loops and a spreader for engaging each looper thread for separating the looper thread from the body of the looper to permit each needle to pass between the looper thread and the body of the looper with which it co-operates."

The looper used by Onderdonk, having a parallelogrammatic or elongated elliptical movement, is known as a four-motion looper. It advances on one side of the needle, shogs in a so-called "needle-avoiding" movement to the other side, retreats and shogs to the side of the needle along which it first advanced. Those movements are repeated with each stitch. Onderdonk's looper advances against the direction of feed and co-operates with a stationary spreader finger to spread the loop. The gist or substance of Onderdonk's invention was stated by Mr. Browne, plaintiff's expert, thus:

"It is the employment, particularly in a multiple needle machine, with the needles abreast, of a looper co-operating with each needle, said looper carrying a looper thread, and moving substantially in the line of feed in its reciprocations, moving forwardly in opposition to the line of fabric feed as it advances to enter a loop of the needle thread on one side of the needle, and being at the opposite side of the needle when the needle enters the loop of the looper thread; and a device to provide a passage for the entrance of the needle between the looper and a strand of the looper thread, which passage otherwise does not exist because the looper reciprocation is substantially in the line of feed of the fabric, this device being a stationary spreader finger below the throat plate, located in front of the needle, and in such position that it holds on to the strand of the looper thread extending to the previously completed stitches as the looper moves sidewise to pass the needle on its retreat on the opposite side from that on which it passed the needle on its advance."

The defendant contends, however, among other things, that claim 16 is a mere aggregation of old elements, and not a patentable combination. The plaintiff concedes that Onderdonk incorporated in his mechanism no new part, but asserts that he combined old elements, so that they operated with beneficial results in a new way. More specifically the plaintiff contends that the method of operation and co-

operation between the four-motion looper and the fixed spreader finger is novel.

That Onderdonk labored in a crowded art is disclosed by the more than 90 prior patents put in evidence by the defendant. But those patents also reveal that the problem he undertook to solve was a continuing one. It is important to learn the state of that art when he entered it.

In the early single needle machines (as, for example, that described in the Grover patent, No. 33,778) the looper reciprocates transversely to the line of the feed of the fabric. It passes into the needle loop on the far side of the needle from the operator. While the needle is above the fabric, and the latter is being advanced a stitch length by the feeding mechanism, the looper moves sidewise, towards the operator, a sufficient distance to permit the needle to descend on its far side. By those combined movements the looper thread, passing backward from the eye of the looper through the needle loop encircling the looper blade to the completed stitch in the fabric, is, without further means, pulled away from the side of the looper and spread in the form of a triangle through which the needle in its descent passes. While this method of spreading the loop, dependent upon the line of feed being at right angles to the line of reciprocation of the looper, and in opposition to the lateral movement or shog of the looper, is feasible and satisfactory for single needle machines, yet, a looper being necessary for each needle, it is not feasible for multiple needle machines, with needles abreast and at right angles to the line of feed.

The art, however, called for multiple needle machines. In response to this demand the needles were first placed in a line diagonal to the line of feed. The transverse loopers were retained by increasing the length of each added looper over that of the preceding one. This arrangement had the defect that the rows of stitches did not begin and end abreast. The further problem was to put the needles abreast and at right angles to the line of feed. To do this it became necessary to make the loopers operate in the line of feed and not transversely. If the loopers were made to operate in that direction, the forward feed of the fabric would not spread the loop, and new methods for accomplishing that result became necessary. Many persons worked upon the problem before Onderdonk, and some attained more or less success, but their efforts constituted merely steps in the advance of the art, and their mechanisms have been largely, if not wholly, supplanted by those of the plaintiff and the defendant.

Of the numerous prior patents put in evidence by the defendant to show invalidity of plaintiff's patent, the defendant seems to rely mainly upon the Grover patent, No. 36,405; the Bigelow patent, No. 365,665; the Rontke patent, No. 582,692; and the Chauvet & Coulter patent, No. 790,782.

The machine of the Grover patent has but a single needle and a transversely operating four-motion looper. Attached to the throat plate at the side of the needle hole is an "assistant looper." Its purpose, however, is not to spread the loop. That is done by the feed of the fabric in one direction and the shog of the looper in the opposite direction. The function of the assistant looper is merely a safety device

to aid, when the stitches are short, in retaining, momentarily, the opening in the loop when formed, and not to assist in spreading the loop. The same is true of the spreader T in the Bigelow patent. On the other hand, in the machine of the Onderdonk patent, in suit, the formation of the loop in the looper thread for the entrance of the needle is due solely to the conjoint action of the looper and the stationary spreader finger which, as shown by the drawings, is placed in front of the needle hole; that is, between the needle hole and the operator. Remove the spreader finger, and the looper loop will not be spread to permit the entrance of the needle. Eliminate the lateral or needle-avoiding movement of the looper, and still the loop will not be spread. If the looper mechanism be turned 90° in the Grover and the Bigelow machines, so that the advancing and retreating movements of the looper are in the line of feed, the looper thread loop will not be opened, for there will then be no co-operation between the looper and the assistant looper. Onderdonk did more than change the direction of the looper movements. He evolved a new co-ordination of elements, so that the spreader finger, co-operating with the looper, does what the feed of the fabric co-operating with the transverse looper did, and what the feed of the fabric is unable to do with the looper reciprocating in the line of feed. Onderdonk's looper mechanism is suitable for multiple needle machines. Grover's and Bigelow's looper mechanisms were not.

The Chauvet & Coulter machine, of patent No. 790,782, has a plurality of needles arranged in a plane substantially at right angles to the line of feed, yet the advance of the looper is in the direction of the feed and there is no spreader finger; the offset of the looper being relied upon to spread the loop. Its mode of operation is not that of the patent in suit.

The machine of Rontke patent, No. 582,692, has a plurality of needles, a looper operating in the line of feed, and "a small loop-detaining hook on the under side of the throat plate"; but the looper has only two motions—backward and forward. It does not shog from side to side of the needle. The loop-detaining hook is at the side of the needle hole, and does not co-operate with the looper to spread the loop; it serves merely to keep the loop open after it has been spread by a shoulder on the looper blade, therein resembling the Grover and the Bigelow assistant loopers. As I see it, the Rontke looper is not an equivalent of the four-motion looper, and the Rontke method of operation is fundamentally different from that of Onderdonk.

Many prior patents of Onderdonk are also relied upon by the defendant. But none of his prior patents show a stationary spreader. The spreader, when there shown at all, is a movable one. The fixed spreader of the patent in suit enables the loopers, and consequently the needles, in a multiple needle machine, to be placed close together— much closer than may be done, if movable spreaders are employed. Hence the movable spreaders of the prior patents of Onderdonk are not adapted to the uses of the combination of the patent in suit.

I think it unnecessary to review other patents of the prior art. I am of the opinion that claim 16 of Onderdonk patent, No. 1,123,576, is not anticipated or otherwise invalidated by anything found in that art.

Claims 14, 15, and 17 are also in issue. Though attacked as invalid in view of the prior art, no attempt was made to support them. I shall not try to discover validity, where the able counsel for the plaintiff evidently failed to find it, and shall without review assume and find that those claims are invalid.

Claim 15 is for a single needle machine, and claim 16 for a machine with multiple needles. Defendant contends that the mechanism for a multiple needle machine is a mere duplication of the mechanism for a single needle machine, and that, claim 15 being invalid, claim 16 is likewise invalid. But I cannot agree with this contention. Two or more separate and distinct sewing machines, each using a single needle, might be driven by power transmitted from one main line shaft. In such an arrangement there would perhaps be no relation, other than mere duplication, between the several lines of stitching, or between the mechanism by which they are made. Such, however, is not the case here. The rows of stitches are parallel, and made in the same piece of fabric at the same time. With Onderdonk's mechanism the rows of stitches may be placed very close together—a most advantageous result, and a problem that is not involved in a single needle machine.

[2] A further defense is that claim 16, together with claims 15 and 17, had their origin in Onderdonk's application, serial No. 420,409, filed March 11, 1908, resulting in patent No. 1,123,579, dated January 5, 1915. These claims were transferred to the patent in suit about November 9, 1914. It has been stipulated that when the transfer was made no supplemental oath was required by the examiner, and that none was then made or filed. The defendant further points out that the production of its machines, alleged to infringe those claims, was begun as early as October 2, 1909, and asserts that claims 15, 16, and 17 are invalid for want of the supplementary oath, particularly against this defendant, and relies on Railway Co. v. Sayles, 97 U. S. 554, 24 L. Ed. 1053, and Patent Office rule 48.

I think this contention unsound. As I see it, the original specification was not enlarged. The original drawings and specifications sufficiently show and suggest the claims finally made, or at least are not inconsistent therewith. Kirchberger v. American Acetylene Burner Co., 128 Fed. 599, 64 C. C. A. 107. The transferred claims are narrower than some of the original claims. In short, I think the transferred claims were "substantially embraced in the statement of invention or claim originally presented," and that claim 16 of patent No.1,123,576 is valid. Has it been infringed by this defendant?

At the time of the issue of the patent in suit the defendant was using a multiple needle machine, in which the looper reciprocated substantially in the line of feed, and in which there was a stationary pin dependent from the throat plate in front of the needle hole. Soon after the Onderdonk patent in suit was issued, the plaintiff notified the defendant that such machines infringed that patent. The defendant did not then, and does not now, deny that charge of infringement. Apparently the pin co-operating with the looper there served to spread the loop. After the receipt of the notice the defendant substituted a slotted throat plate for the throat plate with the dependent pin. Further:

"The shape of the looper blades were changed somewhat; that is, with respect to the eye of the looper, the point, and the bevel, and *also the move-ment of the looper.*" J. P. Weis, Q. 201.

The defendant's machine embodying these changes, and not the one sold prior to the above-mentioned notice, is the machine upon which plaintiff's suit is founded.

The plaintiff contends that the defendant's present machine contains all the elements of plaintiff's invention, operating in the same way, to produce the same result, while the defendant asserts that it differs wholly in mode of operation and substantially in construction from the machine of the Onderdonk patent in suit. Both are multiple needle machines. Both make the Grover & Baker double chain stitch. In both the feed of the fabric is directed across the work plate from front to rear, and at right angles to the looper shaft. Both are provided with four-motion loopers. Plaintiff's machine has a stationary spreader finger dependent from the throat plate at a point immediately in front of the needle hole. Defendant's machine does not have a stationary spreader finger dependent from the throat plate, but it has a groove or slot cut in the bottom of the throat plate. The vertical wall of the slot is in the same relative position with respect to the needle hole as is the vertical wall of plaintiff's spreader finger.

The plaintiff asserts that for the purposes of the combination in suit defendant's slot, or rather the vertical wall thereof, operates in every respect as a stationary spreader, within the meaning of the Onderdonk invention, and within the limitations of the sixteenth claim of the patent in suit. The defendant asserts that the slot and its wall do not co-operate with the looper to spread the looper loop, as does the spreader finger of Onderdonk; that the space between the looper thread loop and the looper blade, through which the needle in its descent passes, is, in the defendant's machine, created by the automatic projection of the looper thread loop from the side of the looper, and that the slot in defendant's machine serves only the purpose and performs only the function that the "assistant looper" did in Grover's machine; that is, not spreading the loop by conjoint action with the looper, but, the loop having been otherwise opened or spread, insuring its remaining spread until it is entered by the needle.

I am of the opinion that defendant's contention is correct. As I view the matter, the mode of operation of defendant's machine is entirely different from that of plaintiff's, and there is no substantial identity between defendant's machine and that called for by the sixteenth claim of the Onderdonk patent in suit. Only the more important differences, resulting in a lack of substantial identity in the mode of operation of the two machines, will be stated:

In the defendant's machine the orbit of the looper is elliptical, and the major axis of the ellipse is inclined at an angle of about 5½ degrees to the line of feed. In plaintiff's machine the path of the looper is more nearly parallelogrammatic. It has a distinct lateral movement, taking place between the end of the forward movement and the beginning of the retrograde movement of the looper blade, and the forward and ret-

rograde movements are parallel, or substantially so, with the line of feed.

The take-up of the looper thread in defendant's machine is produced by the backward motion of the looper. In the forward motion of the looper the entire looper blade passes the point at which the needle descends, so that at the end of this movement the eye of the looper is practically the full length of the looper blade beyond that point, and the thread which passes from the last stitch in the fabric to the eye of the looper is consequently carried the length of the looper blade beyond the point at which the needle descends. The backward motion of the looper does not, of course, begin to be effective as a take-up until the eye of the looper has passed the needle. Consequently the thread leading from the fabric to the eye of the looper when in its most advanced position is made slack by the laterally rearward motion of the looper, and is spread and bowed out therefrom by that retrograde movement, without the aid of a spreader finger or other independent spreader device. The accomplishment of this result seems to be aided by the angle at which defendant's looper reciprocates to the line of feed. The needle penetrates the loop, so spread, before the eye of the looper retreats to the point at which the needle descends. Hence it is only necessary that some means be provided to insure the loop's remaining spread and in proper position until it is entered by the needle. This service, and only this service, as I see it, is performed by the vertical wall of defendant's slot. On the other hand, in plaintiff's machine the looper thread is taut when it is hooked over the spreader finger, and remains so during the lateral movement of the looper, and until the loop so spread is penetrated by the descending needle. The positive conjoint action of the spreader finger and the looper is required to spread the loop. The slot as employed in defendant's machine is ineffective "for engaging each looper thread, for separating the looper thread from the body of the looper," as called for by the sixteenth claim of the Onderdonk patent.

Furthermore, defendant's machine seems to operate according to the disclosure of the twenty-ninth claim of patent No. 1,230,355, issued to Weis & Weis on June 19, 1917, on application filed August 28, 1915, and now owned by defendant. That claim is:

"In a sewing machine having a throat plate provided with one or more needle holes, the combination of one or more needles, one or more loopers located in position to operate close to the bottom of said throat plate, means for actuating the needle and looper, and looper thread retaining means carried by the throat plate and corresponding in number with the number of co-operating needles and loopers, each of said looper thread retaining means located in proximity to its needle hole and effective to retain the looper thread to permit the passage of the needle between the thread and the looper, but ineffective to form a loop in the looper thread."

True, as contended by the plaintiff, the theory of the patentee as disclosed by the original application was that the purpose of the slot was to serve as a spreading means to separate the thread from the body of the looper, but before the patent was issued it was amended, so as to disclose that the purpose of the slot was not to spread the loop, but to retain the thread in loop formation after it is spread, until it is pene-

trated by the needle. The amended application, and not the original, is, I think, the one that correctly describes defendant's mechanism and its mode of operation. Plaintiff's patent, being in a crowded art, must be given a relatively narrow construction. For the foregoing reasons, I am of the opinion that the sixteenth claim of the Onderdonk patent, No. 1,123,576, is not infringed by defendant's machine.

[3] Defendant, by its counterclaim, has charged that plaintiff's commercial machine infringes claim 29, above quoted, of patent No. 1,230,355, issued to Weis & Weis and now owned by the defendant. For the reasons indicated in holding that the defendant's machine does not infringe claim 16 of the Onderdonk patent, I am of the opinion that claim 29 is not anticipated or otherwise invalidated by any patent (including No. 1,123,576 to Onderdonk) of the prior art. I deem it unnecessary to consider the further defenses to that claim, for, assuming it to be valid, I am of the opinion that it is not infringed by plaintiff's commercial machine. In that machine the plaintiff does not use a spreader finger dependent from the bottom of the throat plate, but in lieu thereof does use the slot in which is placed a tongue having its end nearest the needle hole bulged or enlarged. Plaintiff's commercial machine has, also, an independent take-up mechanism, which serves to keep the looper thread taut during the laterally retreating movement of the looper. Consequently the looper thread is not automatically bowed out, as in defendant's machine, by the retrograde motion of the looper. The tongue and slot are not "ineffective to form a loop." On the contrary, the loop is spread only by the conjoint action of the slot, tongue, and looper. Defendant's patent is in the same crowded art in which plaintiff's patent is found, and is entitled only to the same breadth of construction. I think plaintiff's commercial machine falls within claim 16 of the Onderdonk patent, and not within claim 29 of the Weis & Weis patent.

The remaining patents involved in this suit are not concerned with the looper mechanism. Those next to be considered pertain only to trimming mechanism used, however, in connection with sewing machines. They are No. 1,025,552, No. 1,155,533, and No. 1,555,534, each of which was issued to J. P. Weis and is now owned by the defendant. It asserts that certain claims of each patent are infringed by a machine made and sold by the plaintiff (Defendant's Exhibit No. 207), known as the Thompson neck trimmer. This machine is made in conformity with, and is illustrated in detail in, patent No. 1,136,846, issued to Thompson April 20, 1915, on an application filed May 18, 1909. Some of the objects of the invention of that patent are to provide a trimming mechanism, with means for controlling the effective action of the trimming mechanism, whereby it may, at the will of the operator, be rendered effective or ineffective; to provide a trimming mechanism which is located beneath the work support, and has an overhanging cutting blade projecting above the work support, with means for adjusting the support for the overhanging cutting member, whereby the distance that member projects above the work support may be adjusted, and to provide a trimming mechanism so related to the stitch-forming mechanism that one or more only of a plurality of super-

posed layers of fabric may be cut or trimmed, one of the cut edges being deflected away from the stitching mechanism, while the other will be carried flat and unstretched to the stitching mechanism, so that the latter cut edge may be covered by cross-stitching. The Thompson machine was devised for use in "necking garments." As stated in plaintiff's brief, the basis of this operation is the piercing of the folded edge of a fabric by the point of the trimmer blade, which cuts only the under layer; the upper layer passing over the top of the blade, and the sewing mechanism stitching the cut edge fast to the uncut layer. Roughly speaking, the shape of the Thompson trimmer blade and shank is that of an inverted L, with the point towards the operator. It has four motions, up, down, backward, and forward. It cuts on its downward stroke by co-operation with a ledger blade located in the work plate. This method of cutting is essential, since its purpose is to cut only one or more, and not all, of a plurality of superposed layers of fabric.

One of the objects of the invention of the earliest trimmer patent—No. 1,025,552—sued upon by the defendant is "to provide a trimming mechanism having a construction such that, when out of operation, it will act as a guide for the edge of the work." The claims in issue are those specifically addressed to that object. They are:

"3. In combination with a sewing machine, trimming mechanism secured thereto below the work plate and having a trimmer blade, means for projecting said blade through the work plate for trimming, and means whereby the trimmer blade may be thrown out of operation and so located as to operate as a work guide.

"4. A trimming mechanism including a reciprocating trimmer blade, means for throwing the same into and out of operation at will, and a stop for positively locating the trimmer blade, when it is thrown out of operation with its body portion in position to operate as an edge guide for the work."

The controlling factors in determining whether the trimmer blade of plaintiff's mechanism, when not in operation, serves as an edge guide for the work are, I think, the location of the trimmer blade with respect to the needles and the position of the trimmer blade with respect to the fabric. Defendant's Exhibit No. 207 and Figs. 11, 12 and 13 of the Thompson patent, under which that machine was made, show that the trimmer blade is located just forward of the left-hand needle slot. When the trimming mechanism is in operation, the lower layer of the fabric is cut through in such relation to the left-hand needle that that needle, when passing through the upper layer of fabric, passes just outside the cut edge of the piece of the lower fabric, which, as well as the upper layer, is passed through by the right-hand needle. If the blade, when not in operation, be used as a guide for the right-hand edge of the fabric, the latter would not pass under either of the two needles. If, on the other hand, the fabric be fed under the arm of the machine, and the trimmer blade be used as a left-hand guide, the fabric would pass under the right-hand needle only. In the latter event the left-hand needle thread and the looper thread connecting the threads of both needles, not passing through or being held in place by the fabric, would hang or suspend from the line of stitching formed by the right-hand needle thread. Hence the location of the trimmer blade is such

that its use as a right-hand or a left-hand edge guide would prevent the sewing machine itself, of which the trimming mechanism is only a part, from doing any useful stitching, and consequently from accomplishing any useful result or serving any practical purpose. To enable the sewing machine to function properly when the trimming mechanism is out of operation, the body of the fabric must pass over the top of the trimmer blade. In such position the blade has no guiding function whatever. The fact that, when plaintiff's trimming mechanism is in operation, one of the cut edges of the under layer of fabric is deflected by the trimmer blade is a matter with which the claims in issue are not concerned. I am of the opinion that the plaintiff's machine does not infringe claims 3 and 4 of patent No. 1,025,552, or either of them.

[4] Plaintiff's machine will next be considered with respect to patents No. 1,155,533, granted October 5, 1915, upon an application filed June 5, 1903, and No. 1,155,534, granted October 5, 1915, upon an original application filed April 23, 1903, which was divided and divisional application filed September 1, 1911. Each of these patents is for an improvement in trimming mechanism for sewing machines. The expressed objects of the invention of the former are to provide a trimming mechanism which will be positive in its action and trim the work with ease, which can be readily applied to any sewing machine without altering any of the parts of the latter, which may be removed from the machine with facility and thrown out of action when not required. The claims of this patent in issue are:

"4. In combination with the cloth plate of a sewing machine, a trimming mechanism having a fixed blade, and a movable blade, means for securing the trimming mechanism to the machine with the cutting edge of the movable blade below the surface of the cloth plate, means for projecting the movable blade through the cloth plate into operative position and maintaining it thus during its operation, and means whereby the movable blade may be actuated."

"7. In combination, a sewing machine, a trimming mechanism, carried by said machine, having a ledger blade, said trimming mechanism also including a vibratory trimmer blade capable of being moved through the machine cloth plate to an operative position above the surface of the same, means connecting with the driving shaft of the machine for actuating said trimmer blade, and means whereby the trimmer blade may be thrown into and out of action through the cloth plate during the operation of the machine."

"14. In combination, a sewing machine, a fabric trimming mechanism, all the movable parts of which are supported by said machine below the cloth plate thereof and comprising a stationary blade and a vibratory trimmer blade, and means whereby the trimmer blade of said mechanism may be moved through said cloth plate to operative position above the same at will during the operation of the machine."

"18. A trimming mechanism comprising a ledger blade and a co-operating trimmer blade, the latter having a notched portion to receive the work and an overhanging cutting edge, and mechanism for actuating the trimmer blade including means for throwing the latter out of operation and for depressing the cutting edge thereof below the edge of the ledger blade."

"22. In combination with a sewing machine, a trimming mechanism comprising a ledger blade, a reciprocating trimmer blade, and means for actuating said trimmer blade, all the functional parts except the cutting edge of the ledger blade being located below the surface of the cloth plate of the machine, and means whereby the trimming blade may be thrown into and out of action during the operation of the machine and without affecting the usual functions of said machine."

"24. A sewing machine including, in combination, a work support, a trimming mechanism comprising a ledger blade, and a cutting blade projecting above said work support and co-operating with said ledger blade, means for operating the cutting blade, and means for raising the cutting blade above the work support and lowering said blade beneath the same during the operation of the machine, whereby its cutting action is rendered effective or ineffective."

The expressed objects of patent No. 1,155,534 are to provide a trimming mechanism wherein the trimmer blade may be shifted into and out of trimming position at the will of the operator without stopping the trimmer-actuating means, to provide means whereby the trimmer may be depressed below the work plate of the machine, so as to remove the same from interference with the work when trimming is not desired, and to provide a trimming mechanism wherein the trimmer blade is driven from or supported by some operating part of the machine, so that while the blade may be thrown from action the supporting or actuating mechanism may continue in operation. The claims in issue are:

"1. A trimming mechanism for sewing machines comprising a trimmer holder located below the work plate of the machine and carrying a trimmer blade, a means for supporting and also for actuating the holder also located below the work plate, and means connected to the supporting and actuating means for moving the holder independently of the latter means.

"2. A trimming mechanism for sewing machines comprising a trimmer holder carrying a trimmer blade, a means for supporting and also for actuating the holder, and means for actuating the holder independently of its supporting and actuating means, including a rock shaft, manual means for actuating the shaft, and a link connected to the shaft and holder."

"5. A trimming machine comprising a trimmer holder, a constantly vibrating member for actuating said holder, a lever pivoted for movement relatively to said member, a connection between said lever and said holder, means whereby the lever may be manipulated to control the action of the holder without disturbing the action of the vibrating member, all said parts being arranged and operating below the work plate of the machine, a trimmer secured in said holder, whereby the trimmer may be depressed below the work plate out of operative position, and a member operating as a ledger blade for co-operating with said trimmer."

"7. A trimming machine comprising a reciprocating trimmer blade arranged below the work plate, a member operating as a ledger blade for co-operating with said trimmer blade and arranged above the work plate, means for adjustably supporting the ledger blade, means for adjustably supporting the trimmer blade, and means for throwing the trimmer blade into and out of co-operative relation with the ledger blade at the will of the operator."

Certain of the claims of each of these patents were in issue before Judge Hough upon a motion for preliminary injunction in a suit by defendant's predecessor against the plaintiff corporation. Although in denying the motion he referred to the general practice of the courts in refusing to grant a preliminary injunction upon unadjudicated patents, yet he also expressed his opinion both with respect to the claims there involved and also the question of infringement by plaintiff's machine—the identical machine in evidence in this case as Defendant's Exhibit No. 207. I find myself in accord with the views stated by Judge Hough, and think that his statements apply with equal force to all the claims here in issue. He said, in part:

" * * * Each and all of these claims belong to a class of descriptive phrases which can only be understood by a study of the machine, device, process, or apparatus, set forth in specification and drawing. Indeed, such claims can only be understood with reference to the language relating to the *thing* invented by the patentee. When the sewing machine attachment contrived by Weis is examined and compared with previous trimming devices, it is seen to be but one form of an apparatus previously well known. Indeed, it is admitted by Weis himself that one of his inventions relate 'to trimming mechanism which may be thrown into and out of operation at the will of the operator,' and another applied 'to a trimming mechanism which can be applied to any sewing machine.' "

And again:

'Nor am I persuaded by any of the evidence offered that the particular device put forth by the defendant and made an exhibit in this c , infringes Weis' patents. * * * To say that the claims in suit will read upon defendant's machine is not enough. These 'broad and nebulous' claims themselves require interpretation, and when such interpretation is sought in Weis' specification and drawings, I am inclined to the opinion that the exhibit, defendant's machine, *does a different thing, and does it in a different way,* from anything that Weis suggests and illustrates in his application. If this be so, it makes not a particle of difference what kind of a claim Weis got through the office, because the claim is never anything more than descriptive of the thing or process, etc., invented. Nor is there any commercial reason why this plaintiff should enjoin the defendant now from putting forth the particular thing called 'Plaintiff's Exhibit, Defendant's Machine,' for it is plain, upon the affidavits, that this apparatus does not compete with anything actually sold or offered to the public by plaintiff."

The trimmers of defendant's patents are in the class of the ordinary and usual trimmer used for trimming the edges of two or more pieces of fabric being stitched together. Neither mechanism is so designed that it will cut only one or more of a plurality of superposed layers of fabric, or so located with respect to the single needle shown in defendant's machines that it may otherwise perform the work or produce the result of plaintiff's machine. On the other hand, plaintiff's machine is a highly specialized one, and is not capable in normal operation of performing the work or producing the result of defendant's machines. Its use is restricted to "necking garments" and operations substantially identical thereto. Without expressing any views upon other reasons advanced by the plaintiff looking to the same end, I am of the opinion that the defense of noninfringement of patents No. 1,155,533 and No. 1,155,534 must be sustained.

[5] The remaining patent in issue is No. 1,026,839, granted to Weis May 21, 1912, on application filed July 13, 1909. The features of this patent with respect to which the defendant charges the plaintiff with infringement pertain only to a differential feed and binder mechanism. The claims declared upon are:

'2. The combination in a sewing machine of stitch-forming mechanism, differential feeding mechanism, and a binder, the feeding mechanism comprising independent feed dogs having parts arranged in alignment, but separated so as to leave a space between them, and the binder having its delivery end set in said space in front of the stitch-forming mechanism.

'3. The combination in a sewing machine of stitch-forming mechanism, feeding mechanism, and a binder, the feeding mechanism comprising two independent feed dogs having portions in alignment and arranged at one side of the stitch-forming mechanism, and also having other portions arranged in

front of and behind the needle of the stitch-forming mechanism, a binder arranged in front of said needle and between the last-named portions of the said feed parts, and means for giving the feed parts differential movements."

"5. The combination in a sewing machine of a feeding mechanism, a throat plate, and a presser foot, the throat plate, presser foot, and feeding devices of the feeding mechanism having registering cut-out portions, and a binder arranged with its delivery end in said cut-out portions in advance of the stitching position, and with a feed-portion of the feeding mechanism in front of and behind said binder end, and means whereby the binder may be withdrawn from its operative position at will during the operation of the machine."

The defense to these claims mainly relied upon by the plaintiff is that of prior public use and sale of machines embodying the alleged invention for more than two years prior to the Weis application. The machines establishing this defense, as plaintiff contends, are its so called 5600–A machines. Defendant admits that plaintiff did for more than two years prior to July 13, 1909, make and sell machines which plaintiff called 5600–A machines, but denies that plaintiff's testimony (which is uncontradicted by defendant) properly establishes that any of the 5600–A machines made by it before Weis' filing date contained the invention of the Weis patent. As I understand the testimony adduced on the part of the plaintiff, it establishes with unusual certainty that plaintiff's 5600–A machines made during the period in question were equipped as shown in plaintiff's machine, Exhibit No. 51. That exhibit embodies, I think, the alleged invention set out in the claims in suit, and consequently anticipates and invalidates those claims.

A decree in conformity herewith may be submitted.