**TROPIC–AIRE, Inc., v. SEARS, ROEBUCK & CO.**

No. 8849.

Circuit Court of Appeals, Eighth Circuit.

Sept. 5, 1930.

Rehearing Denied Oct. 30, 1930.

BOOTH, Circuit Judge, dissenting.

A. C. Paul, of Minneapolis, Minn. (Richard Paul, Maurice M. Moore, and Paul, Paul & Moore, all of Minneapolis, Minn., on the brief), for appellant.

Otto Raymond Barnett, of Chicago, Ill. (Percival H. Truman, Lawrence T. Barnett, and Barnett & Truman, all of Chicago, Ill., and Doherty, Rumble, Bunn & Butler, of St. Paul, Minn., on the brief), for appellee.

Before KENYON, BOOTH, and GARDNER, Circuit Judges.

KENYON, Circuit Judge.

This is an appeal from a decree of the United States District Court for the District of Minnesota dismissing for want of equity appellant's bill of complaint based on alleged infringement of reissue letters patent No. 17,131, which had been issued to appellant as assignee of Orville S. Caesar, the inventor, November 13, 1928, for an improvement in heating apparatus for automobile vehicles (original patent No. 1,668,490 was issued May 1, 1928).

The trial court held that claims 6 and 7, being the ones alleged to be infringed by appellee's device, were so limited by the prior art that appellee's device was not an infringement thereof. Claim 6, which is also one of the claims of the original patent, is as follows:

"A heating system for motor-driven vehicles, comprising an engine cooling system including an inter-communicating jacket and radiator for a circulating cooling liquid, an air heating and distributing unit embodying a liquid receiving chamber in communication with the engine cooling system to form in conjunction with said system a circuit for circulation of liquid between said receiving chamber and engine cooling system, said receiving chamber being traversed by air passageways for heating air traveling through the passageways by heated liquid received from the engine cooling system, and a variable-speed fan positioned in relatively close relation to the liquid receiving chamber for causing a more or less frequent recirculation of air through the liquid receiving chamber and the interior of the vehicle to be heated for effecting controlled variations of temperature within the interior of the vehicle, said liquid receiving chamber and fan being located within the interior of the vehicle and isolated from exhaust gases and fumes generated by the engine of the vehicle."

Claim 7 of the reissue application was not included in the application for the original patent. It is as follows:

"A heating system for motor-driven vehicles, comprising an engine cooling system including an inter-communicating jacket and

radiator for a circulating cooling liquid, an air heating and distributing unit embodying a liquid receiving chamber in communication with the engine cooling system to form in conjunction with said system a circuit for circulation of liquid between said receiving chamber and engine cooling system, said receiving chamber being traversed by air passageways for heating air traveling through the passageways by heated liquid received from the engine cooling system, and a fan positioned in relatively close relation to the liquid receiving chamber for causing a circulation of air through the liquid receiving chamber and the interior of the vehicle to be heated, said liquid receiving chamber and fan being located within the interior of the vehicle and isolated from exhaust gases and fumes generated by the engine of the vehicle."

Both claims state substantially the same combination of elements. Claim 6, however, adds the limitation that the fan employed "is a variable speed fan."

Caesar's original claims were all rejected by the Patent Office, the rejection stating, in part: "It is also not a matter of invention to use an air circulator with an air heater, as in claim 4, this being an expedient old and common in the heating art. * * * Since the combination covered by claims 1 to 6, inclusive, is shown to be old by the art cited, these claims are each rejected." Caesar acquiesced in the rejection of his original claims by canceling them. He then substituted six additional claims, one of which was canceled and the others allowed after various amendments and conferences. Appellee maintains that appellant in claims 6 and 7 is contending for exactly what was covered in original claim 4, which is as follows:

"The combination with an internal combustion engine including a water-jacket, a water-cooling radiator and a connection between the water-jacket and the radiator, of an air-heating member mounted within the vehicle body, conduits connecting said member with said connection, means in the connection for diverting substantially all or a portion of the water through said member, and means adjacent to said air-heating member adapted to force air therethrough and circulate the heated air within the vehicle body."

That it bears some similarity to claims 6 and 7 of the reissue patent application is apparent. It is unnecessary, however, in our view of the case to discuss how claims 6 and 7 of the reissue application may be affected by the rejection of claim 4 of the original application.

It is appellant's theory that claims 6 and 7 of the Caesar patent present a new combination of old elements resulting in a "small compact liquid receiving chamber, in communication with the engine cooling system of a motor driven vehicle, being traversed by air passageways for heating air traveling through the passageways by means of the heated liquid received from the engine cooling system, and a fan positioned in relatively close relation to the liquid receiving chamber for causing a circulation of air through said chamber and the interior of the vehicle to be heated, the liquid receiving chamber and fan being located within the interior of the vehicle and isolated from exhaust gases and fumes generated by the engine of the vehicle"; that said combination so set forth is valid and the structure described therein discloses a radical improvement over anything in the prior art of automobile heating and has practically revolutionized the same; that it is the last word in automobile heating devices, simple, efficient, and practical, and has achieved great commercial success; that manufacturers of Packard, Cadillac, and Hupmobile cars, and also the General Motors Company, have endeavored to secure licenses to manufacture the same, all of which appellant argues tends to show novelty and invention. It relies upon the well-established proposition of law that a combination patent may be valid even if all the elements are old, provided the combination is new and produces a new result, or an old result in a new and more efficient way.

Appellee maintains that its device is in no way an infringement; that in view of the prior art there is no invention in the Caesar device; that Caesar entered the field after the possibility of heating automobiles by means of a radiator supplied with hot water from the heating jacket was fully known, and after many other patentees had shown the desirability of a heating unit comprising an incased radiator and an electric fan to recirculate the air of a compartment from the radiator, and especially after Modine had developed with great commercial success a form of such heating unit with radiator of the cellular type, and had taught to the public that such structure was far more efficient than the commonly used type of heating radiators, and that such radiating units could be made of any size required to adequately heat any specified compartment; that the commercial success of appellant's heater carries no implication of patentable novelty, but is due to the

publicity methods employed, assisted by the decree in the Jumper case and an alliance between appellant and its licensees; that claims 6 and 7 of the Caesar patent disclose nothing of originality or patentable novelty; and that, to use the words of appellee's brief:

"Caesar did nothing but to accept such teachings by replacing the less efficient coil radiators of previous automobile hot water heaters with a heater unit of the Modine type, making the unit of no larger size than was adequate to heat the compartment in which it was located, to wit, the interior of an automobile.

"In so doing there was no 'adaptation' of the Modine device to automobile heating. Caesar simply disconnected the heating radiator of prior devices from the hot water pipes connecting the interior of the car with the water jacket and coupled on a Modine heater unit of a suitable size for the work required."

We set forth figures 1 and 2 of the Caesar device which illustrate the general plan of operation:

Fig. 1

Fig. 2

13 is the connecting pipe leading from the top of the engine jacket 11 to the top of the cooling radiator 12 by a valve not designated on these diagrams. The cooling water may pass direct from the top of the engine jacket into the cooling radiator and thence through the radiator and back to the engine jacket or part of the water may be directed into pipe 35 leading to the heating radiator inside of the car and thence back through pipe 30 to a connection which fits into 32 as a connection to 13 to the top of the cooling radiator. The heating radiator is in series with the cooling radiator and the water jacket, so that the water of the cooling system passes through the cooling radiator regardless of whether some or all of such water is diverted through the heating radiator before it reaches the cooling jacket.

Appellee's device is on the market as the Mephisto hot water heater, and sells for practically one-half the price of appellant's device. The directions for installing the same are in the record and the process is very simple. An illustrative diagram of the same used in its advertising circulars is herein set forth:

This installation is described by appellee as follows:

"The hot water used for heating the interior of the car is diverted from the connecting pipe between the engine jacket and the top of the cooling radiator and having passed through the heating radiator in the car is returned to the pipe leading from the bottom of the cooling radiator to the bottom of the engine jacket. Thus, with defendant's installation the heating radiator is in parallel with the cooling radiator and the water which passes through the heating radiator is diverted from the cooling system so far as the cooling radiator is concerned and does not pass through the cooling radiator."

Appellant contends that claims 6 and 7 read directly and specifically upon this device; that the structure has every element of these claims; that said structure has in combination with the engine cooling system, including an intercommunicating jacket and radiator for a circulating cooling liquid, certain elements of appellant's claims, such as

"(b) An air heating and distributing unit embodying a liquid receiving chamber in communication with the engine cooling system to form in conjunction with said system a circuit for circulation of liquid between said receiving chamber and engine cooling system.

"(c) Said receiving chamber being traversed by air passageways for heating air traveling through the passageways by heated liquid received from the engine cooling system, and

"(d) A fan positioned in relatively close relation to the liquid receiving chamber for causing a circulation of air through the liquid receiving chamber and the interior of the vehicle to be heated.

"(e) Said liquid receiving chamber and fan being located within the interior of the vehicle and isolated from exhaust gases and fumes generated by the engine of the vehicle."

The trial court points out some of the differences in the devices as follows:

"The defendant's device is different in shape and size, uses a different form of radiator or heating element, employs a blower instead of a fan, is connected with the water cooling system in a slightly different way, and is intended to be located inside of the car in a different place than the Caesar heater. The air from the blower of the defendant's device is forced into a chamber below the radiator, and thence through the radiator, where it is heated and passes into the body of the car. The blower takes the place of Caesar's electric fan, the radiator in each case performs the same function, and the result produced is substantially identical."

There are also other differences of structure and of operation. Caesar's heat transfer chamber is not used by appellee. In Caesar's device the heating radiator is in series with the cooling radiator and the water jacket, while in appellee's device it is in parallel with the cooling radiator, and the water which passes through the heating radiator is diverted from the cooling system and does not pass through the cooling radiator.

Appellee claims some advantage by reason of the use of a blower instead of a fan, its plan resulting in a uniform speed of air from an inclosed chamber under the radiator.

Appellant does not contend that the Caesar patent covers every type of hot water heater for an automobile, but that none of the many hot water heaters have been successful and none of them disclose the Caesar combination.

The trial court found that Caesar designed the first successful hot water heater for automobiles. It had had before it at a previous time an application for a preliminary injunction involving the original Caesar patent No. 1,668,490 [Tropic-Aire, Inc., v. Jumper et al., 28 F.(2d) 631], and had held that the Caesar patent owned by the Tropic-Aire Company was infringed by what was known as the Jumper device, and that a temporary injunction should be granted, indicating in its opinion that the patent was valid, had achieved great commercial success, and had satisfactorily solved an old problem. After this injunction was granted the suit was dismissed, one of the defendants taking a license from appellant. Upon the hearing for temporary injunction in the present case, the court granted a preliminary injunction, holding that the device of appellant infringed some of the claims of reissue patent No. 17,131, and that the presumption of validity of the patent was stronger than when it decided the Jumper Case.

Upon the trial of this case the court in its opinion referred to its decision in the Jumper Case, supra, and said:

"I was of the opinion that, since the Patent Office had seemed to distinguish between the general art of heating and the art of heating automobiles, and since nothing like Caesar appeared from the record in that case to have been known in the latter art, his broad

claims might be sustained on the theory that they related to a distinct art.

"I should like to adhere to that conclusion, but feel forced to abandon it. There cannot logically be any distinction between heating a stationary compartment and a moving one. Obviously, all that is necessary to make the Modine unit or the Frank unit effective is a flow of steam, hot water, or other heating medium for the radiator and a source of electricity for the electric fan. To attach such a heater to the steam line in a railroad car would not constitute invention, nor would it be invention to install it in a street car. To hold that it would be invention to adapt it to the heating of an automobile, would be drawing a distinction which could not logically be sustained. It has been said that where the adaptation of an old device to a new use is outside the range of mechanical skill, it will constitute invention; but it would seem to be illogical to hold that the heating of an automobile is not analogous to the heating of a street car, passenger car, or stationary compartment."

It pointed out that the Caesar heater had met with great commercial success; that it was the best, safest, and most practical means for heating automobiles, and that if there was any substantial doubt as to whether what Caesar did constituted invention, the effect upon the art of the device and the general public approval with which it had been met settled the question in favor of the validity of the patent; that while defendant's structure differed in form and in detail, both structures were in effect the equivalent of each other. It stated there was no novelty in the combination of a radiator and an electric fan contained in a single casing and used as a heating device in and of itself, and that: "It is a matter of common knowledge that water in the engine's cooling system is heated by the engine's cylinders; that the water circulates through the system; that it can be conducted by pipes from the system into the body of the car and back to the system, so that there will be a flow of hot water through those pipes. That has been pointed out by patents in the prior art. To make an ordinary connection between a water cooling system of a gasoline engine and a Modine or Frank heater would be well within the range of mechanical skill, and would not constitute invention."

The final conclusion of the court was that defendant's device was simply another adaptation of an old scheme to the heating of an automobile, and that it was impossible, in view of the prior art, to hold that a suffi-

cient breadth could be given to claims 6 and 7 to prevent the appellee from marketing its device. The court evidently granted the preliminary injunction in the Jumper Case and in this case under the belief that the Patent Office treated automobile heaters as a distinct art, while in fact it regarded the inner space of an automobile as one to be heated as any other space. The learned court was reluctant to change its former holding, but felt compelled after a thorough consideration of the law and facts so to do.

It is apparent that, as is usual in patent cases, the question of the prior art is of commanding importance. Caesar entered a crowded field. The evidence shows that hot water automobile heaters, the use of an electric fan for recirculating air in connection with heating, the varying of the speed of a fan circulating air from a heating radiator in order to control the heating, were old; nor was there anything new in the method of installing the hot water radiator in series with the water jacket and the cooling radiator of an automobile engine.

Professor Sidney A. Reeve was a witness for appellee. He pointed out the condition of the prior art, referring to and explaining the Sturtevant patent of 1869, which disclosed a combination of blower and radiator for heating or cooling air, the patent to Corbin and Foster of 1897, disclosing a combination of fan-blowing air over a radiator for the heating of a room or other compartment, and that an electric fan may be used to produce the current of air; the British patent to Daimler of 1899, disclosing the idea of heating an automobile by means of fan drawn air over a radiator in which the source of heat was the hot water circulated over the jackets of the engine cylinders; the United States patent to Hawkins of 1901, which disclosed the unit idea of a small radiator built in combination with an electric fan blowing air over it; United States patent to Keith of 1901, which disclosed the idea of pulling air over a radiator by means of an electrically driven fan; the patent to Grayson of 1908, to Peck of 1909, which disclosed the recirculation of air by a variable speed fan; the patent to himself in 1915, which disclosed a recirculation of air within the compartment of a vehicle or car by blowing air by means of a variable speed fan over the coils which supply the heat; the patent to Frank of 1919, which disclosed a combination of the fan with electric motor inside a casing, which also inclosed two heating units; also the patent to Modine of April 24, 1928, application being

filed April 7, 1923, antedating the Caesar patent. This patent, as affecting the present case, is the most important one of the prior art, and we refer to it at some length. The Hawkins, Sturtevant, and Frank patents are of minor importance.

Parts of the diagrams of the Modine Unit (1,666,907) are here inserted, from which a general idea of how it functions may be observed:

The affidavit of Modine was presented in which he testified to the characteristic features of his heater. In the application for his patent, he states:

"My invention belongs to that general class of devices known as heating apparatus, and relates particularly to a heating unit adapted to be used in shops, factories, garages, storage warehouses and such other places as the same may be applicable.

*Fig. 1.*

*Fig. 2.*

"The invention has among its objects the production of a device of the kind described that is simple, compact, convenient, of light weight, durable, efficient and satisfactory, and which may be installed at any desired point."

He testified, that:

"The installation of the unit heaters in the Johnson factory for room heating prior to February 7, 1925, is the same in every respect to the installation of a smaller unit heater for heating a smaller room such as the passenger compartment of a motor car. Many other Modine unit heaters have been sold and installed in the Johnson factory and their performance has been very satisfactory.

"The Modine unit heaters sold and installed prior to 1925 each comprised a radiator core and an electric motor and fan assembled as a unit and supported by the inlet and outlet pipes of the radiator in the room to be heated."

Modine in 1916 incorporated the Modine Manufacturing Company and developed the Modine Turbotube radiator, of which several million have been sold by that company. Prior to 1925 these radiators were applied to what was known as the Modine Unit heater for general application to room, compartment, and space heating. The Turbotube core was the unique feature of these radiators. It consisted of "narrow copper tubes through which the hot water passes from top to bottom of the radiator and thin copper fins joining the tubes and spaced in close relationship."

The Turbotube core used in the HaDees heater, which figures in the Jumper Case, supra, embodies the inventions and improvements found in the Modine Turbotube radiator. Modine testified that long prior to 1925 he had conceived the idea of using a radiator core of the Turbotube type in combination with an electric motor and a fan for general space heating. Tests of his heater were made by Professor Willard of the Department of Mechanical Engineering of the University of Illinois, who reported on the same May 14, 1926. This Modine Unit heater was used in drying automobile bodies, paint on steel and laths; in drying meats and hides, drying in cleaning plants, apartment house laundries, bottling works, paint, varnish rooms, and dishes in hotels and restaurants. Modine testified that the application of the Modine Turbotube Unit heater to car heating is made in the same way as its application to other room, compartment, or space heating, the size of the radiator core and fan being proportionate to the size of the space or compartment to be heated; that one of the small sized Modine Units was sold by his company to Versare Corporation of Albany, N. Y., September 14, 1927, for use as a passenger bus heater, which was about one year before Caesar's reissue application was filed; that in October, 1927, Mr. Bates, representing Burd High Compression Ring Company and Liberty Foundries Company, called at the office of the company in Racine, Wis., with a view to purchasing a Modine Unit heater of a size suitable for car heating; that many of the small Turbotube cores have been sold for the HaDees heater, and that this heater is nothing but a small sized Modine unit heater, and the fact that it is used for heating automobiles is merely one more "of the many applications of my Modine Unit heater to room, compartment, or space heating." From Modine's affidavit in evidence by stipulation we quote:

"Long prior to 1925, I conceived the idea of using a radiator core of the Turbotube type in combination with an electric motor and a fan for general space heating. My idea was to employ a motor-drive fan to blow air through the radiator core and to assemble the motor fan and radiator in a unit so that the inlet and outlet pipes of the radiator could be connected with any hot water or steam system and would serve to support the united in any desired position. A unit heater of this kind could be easily installed in connection with any hot water or steam system for room, compartment or space heating and for circulating heated air in connection with commercial or industrial operations."

Dixon, Perkins, and Professor Willard's report corroborate the testimony of Modine. Dixon testified:

"The smallest size Modine unit that the Modine Company has installed for room heating purposes has a core 9x9″ in size which is approximately the size of the core in the HaDees car heater."

It is without question under the evidence that the Modine heater antedated Caesar, and it was used for car heating as embodied in the HaDees heater before Caesar's original patent was granted May 1, 1928, and the Caesar application for reissue was after the introduction of the HaDees heater on the market, to stop the sale of which the suit for infringement was started in the fall of 1928. Jumper Case, supra. It was commercially successful and the very points urged for the Caesar heater, such as compactness, ease of installation, efficiency, recirculation of air, were found in the Modine Unit. There seems to be

little difference between the Modine Unit heater structure and the Caesar Unit, except possibly as to the construction of the heater core. Appellee's heater core is of the same type as the Modine core. The circulars in evidence illustrate the structure of the Modine heater and show the same assemblage of elements as the Caesar device, viz., the casing containing radiator with proper connection for attaching the same to a hot water system, the variable fan and the switch. They point out that all that is necessary for installation is to connect the radiator of the unit with hot water pipes by the use of a wrench and two or three minutes of time.

Frank, patentee of the Frank patent of 1919, showed by his testimony the commercial success of his heater with or without a variable speed fan.

The Waters patent of 1926 showed a hot water heater for an automobile substantially identical with that of Caesar, except that the heating radiator within the car was an ordinary radiating coil. The radiator is described as follows: "A radiating member 21, which may be placed at any convenient location along the floor of the car to suit requirements. Any suitable form of radiating member which will permit of circulation of water therethru may be employed."

As to the claim that the Caesar heater obviated objectionable gases and odors, we may call attention to the specification of the Waters patent, as follows: "A circulation of comparatively hot water may be maintained to provide the desired degree of warmth in the car; and it will be appreciated that as water retains its heat for a considerable period, the stopping of the engine will not immediately shut off the supply of heat as is the case with heating devices receiving their supply of heat from the exhaust of the engine. Moreover, there is no danger of objectionable odors from the exhaust entering the car through the use of the novel heating device."

In this condition of the prior art, even if it be granted that invention existed, it is apparent that claims 6 and 7 are so limited that the range of equivalents would be exceedingly narrow, and the question of infringement by appellant's device would be a very close one. Duff v. Sterling Pump Co., 107 U. S. 636, 2 S. Ct. 487, 27 L. Ed. 517. The question, however, as to whether there was any patentable invention in claims 6 and 7, in view of the prior art, cannot be passed by. Try as we may, we cannot convince ourselves that Caesar did anything more than to

use ordinary mechanical skill in connecting a Modine Unit to the hot water cooling system of an automobile. He mounted a small Modine heater inside of an automobile and attached it to the water supply system thereof so as to perform the same function in heating the automobile space that it would perform in heating any other space. That this was a new thought may be conceded, but new thoughts which merely involve the working out of mechanical skill to produce a result are not patentable.

Appellant argues that the Modine Unit to be used for automobile heating would have to be reconstructed, but does not point out what the alleged necessary reconstruction would be. The HaDees heater shows that the Modine unit could easily be applied to automobile heating without any substantial change in construction. In the application for the patent Modine sets forth that it was a heating apparatus and related to the heating unit, not only adapted to shops, factories, garages, etc., but "such other places as the same may be applicable."

Why is not an automobile space one of "such other places"?

If Caesar was the first to use a Modine Unit in the interior of an automobile, he was merely doing in this space what the Modine Unit had done in a stationary space.

Is reproducing a Modine Unit in smaller size than formerly produced invention? Is there invention in taking a heating unit that is adapted to heating a compartment, a shop, an office, or other space which is stationary, and using it in an automobile, a street car, a railroad car, or anything else on wheels? If a person should invent a heater planned after the Caesar heater but for use in an airplane, would there be any inventive thought in that? Is there any patent divinity that surrounds an appliance merely because it is used for a moving space instead of a stationary space? A patent must be the creation of inventive faculty and imagination. There must be something more than is obvious to persons skilled in the art. Mere novelty and utility is not invention, and cannot be a substitute therefor. Neither is ingenuity invention. A patent monopoly rests upon inventive genius and the line between invention and mechanical skill is ofttimes a close one, almost impossible to discern. In Atlantic Works v. Brady, 107 U. S. 192, 200, 2 S. Ct. 225, 231, 27 L. Ed. 438, the court said: "The design of the patent laws is to reward those who make some substantial discovery or invention, which adds to our knowl-

edge and makes a step in advance in the useful arts. Such inventors are worthy of all favor. It was never the object of those laws to grant a monopoly for every trifling device, every shadow of a shade of an idea, which would naturally and spontaneously occur to any skilled mechanic or operator in the ordinary progress of manufactures." The multitude of cases dealing with the subject of invention evidences the difficulty courts have had in determining what invention really is.

What do the cases say on this interesting subject? To hold this opinion within any reasonable bounds, the excursion into that field must be limited.

Judge Sanborn in his usual clear manner in National Hollow Brake-Beam Co. et al. v. Interchangeable Brake-Beam Co. (C. C. A.) 106 F. 693, 706, 707, says: "A new combination of old elements, whereby a new and useful result is produced, or an old result is attained in a more facile, economical, and efficient way, may be protected by patent as securely as a new machine or composition of matter." Again in Mallon et al. v. William C. Gregg & Co. et al. (C. C. A.) 137 F. 68, 76, 77, he says: "The application of an old device to a new use is not in itself an invention or capable of protection by a patent. A prior patentee who has plainly described and claimed his machine or combination has the right to every use to which his device can be applied, and to every way in which it can be utilized to perform its function, whether he was aware of all these uses or methods of use when he claimed and secured his monopoly, or not."

In Kelly et al. v. Clow et al. (C. C. A.) 89 F. 297, 303, the court said: "In determining whether a new combination of old elements constitutes invention, the most important and controlling considerations are the intrinsic novelty and utility of the concrete invention."

Quite in point is DeVry Corp. v. Acme Motion Picture Projector Co. (C. C. A.) 262 F. 970, 971: "In the present case the claims in suit and the specification explanatory thereof make it clear that Lockwood contributed nothing to the strict art of projecting moving pictures, and that his improvement consisted in ventilating by means of a rotary fan the moving picture cabinet in order to prevent the inflammable film from being subjected to excessive heat. If invention may be predicated upon that act, then any one could obtain a monopoly of the use of a ventilating fan in every cabinet or box or room into which he put a different apparatus, or in which existed a different condition on account of which he desired ventilation for a different purpose."

In Detroit Motor Appliance Co. v. Burke et al. (D. C.) 4 F.(2d) 118, the court lays down a number of tests to determine combination patentability:

(a) Has the efficiency of an old process been increased?

(b) Has a new and useful result been reached? Or,

(c) Has an old result been produced in a better, cheaper or more effective way?

If any of these exist, the court says the combination may be patentable. We may say in passing that we do not agree with the contention of counsel for appellants that the opinion in this case is contrary to Judge Sanborn's opinion in the present case, 44 F. (2d) 577. The cases are readily distinguishable.

In Lionne Co. v. Cushman-Hollis Co. (C. C. A.) 7 F.(2d) 83, the patent at issue related to the method of protecting white shoes from soil during the process of manufacture. The invention consisted in applying by air brush to white shoes a liquid combination. The court says it is not invention to use an old process for a new and analogous purpose. The court held the patent void for want of invention, making it unnecessary to consider whether it was not also void by reason of prior knowledge and use by others, and referred to the fact that manufacturers having air brushes and white dope in use at their factories would naturally think of combining their use with air to get economical and efficient results.

In Office Specialty Mfg. Co. v. Fenton Mfg. Co., 174 U. S. 492, 498, 19 S. Ct. 641, 643, 43 L. Ed. 1058, the court held that the patent at issue was nothing more than an aggregation of prior well-known devices, each constituent of which performed its own function in the old way, and: "Where a combination of old devices produces a new result, such combination is doubtless patentable; but where the combination is not only of old elements, but of old results, and no new function is evolved from such combination, it falls within the rulings of this court in Hailes v. Van Wormer, 20 Wall. 353, 368 [22 L. Ed. 241]; * * * Palmer v. Corning, 156 U. S. 342, 345, 15 S. Ct. 381 [39 L. Ed. 445]; Richards v. Chase Elevator Co., 158 U. S. 299, 15 S. Ct. 831 [39 L. Ed. 991]. Hoffman may have succeeded in producing a shelf

more convenient and more salable than any which preceded it, but he has done it principally, if not wholly, by the exercise of mechanical skill."

In Richards v. Chase Elevator Co., 158 U. S. 299, 303, 15 S. Ct. 831, 833, 39 L. Ed. 991, which is referred to in Office Specialty Mfg. Co. v. Fenton Mfg. Co., 174 U. S. 492, 19 S. Ct. 641, 43 L. Ed. 1058, the Supreme Court, in referring to the patent there for a grain transferring apparatus, says: "It might as well be claimed that the man who first introduced an elevator into a private house, it having been previously used in public buildings, was entitled to a patent for a new combination."

In Inland Mfg. Co. v. American Wood Rim Co. (C. C. A.) 14 F.(2d) 657, 659, the court held a patent for wooden steering wheel for automobiles valid; that the steering wheel was clearly an advance over the prior art, and had been accepted as a satisfactory, if not a final, response to the demand for a steering wheel that would eliminate the disadvantages of the wheel of the prior art; and that it was entitled to the presumption of invention which attaches to a patent. The court said: "The line between the skilled mechanic and the ingenuity of the inventor cannot be accurately drawn in any given case, but where a demand has long existed, and men skilled in the art have sought to meet that demand without success, the argument that the methods employed by the inventor who has solved the problem are so obvious as to involve only mechanical skill, is not entitled to very serious consideration."

This court, in Western Willite Co. v. Trinidad Asphalt Mfg. Co., 16 F.(2d) 446, 450, said: "All the elements in this patent, or their equivalents, have been frequently employed in some combination for the production of the same or a kindred product; their functions remain unchanged. In the present combination it is claimed that a better result is obtained, but this does not amount to invention. As said by the Supreme Court in Smith v. Nichols [21 Wall. 112, 22 L. Ed. 566], supra, and by Judge Hook in Sloan Filter Co. v. Portland Gold Mining Co. [(C. C. A.) 139 F. 23], supra, it involves the mere carrying forward, or more extended application of, an original idea involving a change only in form, proportion, or degree, and resulting in the doing of the same work in the same way and by substantially the same means."

Ford Motor Co. v. Parks & Bohne (C. C. A.) 21 F.(2d) 943, 950: "Our conclusion is that the patents in suit are clearly devoid of any patentable novelty whatever, and that the claims in suit are completely anticipated by the prior art hereinbefore referred to; that any narrowing interpretation of any of these claims, which could in any way distinguish them from the prior art, would necessarily make them inapplicable to appellant's construction."

Pearce v. Mulford, 102 U. S. 112, 118, 26 L. Ed. 93: "All improvement is not invention, and entitled to protection as such. Thus to entitle it, it must be the product of some exercise of the inventive faculties, and it must involve something more than what is obvious to persons skilled in the art to which it relates."

Florsheim v. Schilling, 137 U. S. 64, 11 S. Ct. 20, 34 L. Ed. 574: "A new arrangement or grouping of parts or elements of a patented article, which is the mere result of mechanical judgment, and the natural outgrowth of mechanical skill, is not invention."

Thatcher Heating Co. v. Burtis, 121 U. S. 286, 294, 7 S. Ct. 1034, 1038, 30 L. Ed. 942: "It is admitted that what Thatcher did, and all that he did, was to transfer this well-known fuel magazine from its use in an outstanding base-burning stove to a fire-place heater, equally well known and in common use as to its arrangement, construction, position, and mode of operation. When this fuel magazine was thus transferred from one kind of stove to another, in its new situation it performed precisely the same function, with respect to the fuel and the fire, as it had always been accustomed to perform in its old place, and the fire-place heater into which it was thus newly placed, so far as the generation and transmission of heat and heated air are concerned, operated precisely as it had habitually done before."

In C. & A. Potts & Co. v. Creager, 155 U. S. 597, 15 S. Ct. 194, 39 L. Ed. 275, the court cites the instance of a person taking a coffee mill and patenting it as a mill for grinding spices, which plainly would be a mere double use, and says that if what is done would be suggested to the mind of an ordinary skillful mechanic and could be done without material change, then the adoption of a new use is not invention. The court sums up the doctrine as follows, page 608 of 155 U. S., 15 S. Ct. 194, 199: "As a result of the authorities upon this subject, it may be said that, if the new use be so nearly analogous to the former one that the applicability of the device to its new use would occur to a person of ordinary mechanical skill, it is only a case of

double use; but if the relations between them be remote, and especially if the use of the old device produce a new result, it may at least involve an exercise of the inventive faculty. Much, however, must still depend upon the nature of the changes required to adapt the device to its new use."

The reasoning of the Supreme Court in *McClain v. Ortmayer*, 141 U. S. 419, 426, 427, 12 S. Ct. 76, 78, 35 L. Ed. 800, on the general subject is so clear and complete that we quote from it somewhat at length:

"What shall be construed as invention within the meaning of the patent laws has been made the subject of a great amount of discussion in the authorities, and a large number of cases particularly in the more recent volumes of reports, turn solely upon the question of novelty. By some, 'invention' is described as the contriving or constructing of that which had not before existed; and by another, giving a construction to the patent law, as 'the finding out, contriving, devising, or creating something new and useful, which did not exist before, by an operation of the intellect.' To say that the act of invention is the production of something new and useful does not solve the difficulty of giving an accurate definition, since the question of what is new, as distinguished from that which is a colorable variation of what is old, is usually the very question in issue. To say that it involves an operation of the intellect, is a product of intuition, or of something akin to genius, as distinguished from mere mechanical skill, draws one somewhat nearer to an appreciation of the true distinction, but it does not adequately express the idea. The truth is, the word cannot be defined in such manner as to afford any substantial aid in determining whether a particular device involves an exercise of the inventive faculty or not. In a given case we may be able to say that there is present invention of a very high order. In another we can see that there is lacking that impalpable something which distinguishes invention from simple mechanical skill. Courts, adopting fixed principles as a guide, have by a process of exclusion determined that certain variations in old devices do or do not involve inventions; but whether the variation relied upon in a particular case is anything more than ordinary mechanical skill is a question which cannot be answered by applying the test of any general definition."

In Wirebounds Patents Co. v. H. R. Gibbons Box Co. (C. C. A.) 25 F.(2d) 363, 365, the court said: "It cannot be considered invention to describe and claim a process, or to produce a machine, or formulate a method which any successful mechanic would produce when required to effectuate a given result." See Lyman Mfg. Co. v. Bassick Mfg. Co. (C. C. A.) 18 F.(2d) 29, 34; Galvin Electric Mfg. Co. v. Emerson Electric Mfg. Co. (C. C. A.) 19 F.(2d) 885.

Sodemann Heat & Power Co. v. Kauffman (C. C. A.) 14 F.(2d) 393, and Cadillac Motor Car Co. et al. v. Austin (C. C. A.) 225 F. 983, emphasize the importance of a new result in determining patentability. Is it a new result to heat the space of an automobile as similar space in offices, shops and foundries is heated? If so, it would be a new result to take a lamp from one room and light another room with it, to move an electric stove from a large room to heat a smaller one. Surely these are not new results as contemplated by the patent law.

That the Caesar patent achieved considerable commercial success cannot be doubted. It did not amount, however, to practical exclusion of other heaters. It appears that the sales of Caesar heaters by appellant and his licensees, Liberty Foundries Company and Noblitt-Sparks Company, up to December 19, 1929, amounted to $351,540; that in 1928 Liberty Foundries paid the Tropic-Aire a royalty of $9,700.66 on 13,287 heaters, and in 1929 it paid a royalty of $80,601.94 on 111,240 heaters; that in 1929 Noblitt-Sparks paid a royalty of $82,651.55. In this connection it may be stated that Tropic-Aire spent for advertising, in 1927, $3,723.12; in 1928, $38,224.80; and in 1929, $75,823.49. It also appears that many requests for licenses were made and much correspondence appears in the record from different manufacturing companies soliciting licenses.

There are certain presumptions available in patent litigation, such as validity, utility, and invention, from the fact that a patent has been issued by the Patent Office. When the question of invention is in doubt it seems to be the holdings of the courts that general acceptance by the public of the device and the commercial success thereof is evidence to support the presumption of patentability by virtue of the issuance of the patent. The court in Temco Electric Motor Company v. Apco Mfg. Co., 275 U. S. 319, 48 S. Ct. 170, 72 L. Ed. 298, says the District Court was affected in its decision that the patent involved invention by the way in which the public eagerly took it and its marked success, and that it was likewise affected. We do not think that case establishes the doctrine that

invention is necessarily shown by commercial success. The most that can be claimed is that commercial success may be resorted to as evidence of invention where other facts leave the question in doubt.

In Zip Mfg. Co. v. Pusch, 2 F.(2d) 828, 831, this court points out that where the question of whether a change is an invention or merely an improvement is close, legal presumptions are available. "One of these is that the granting of a patent carries with it the presumption of novelty. * * * Another is that one attacking the validity of a patent is required to make good that attack with reasonable clearness." Acme Foundry & Mch. Co. v. Oil Well Improvements Co. (C. C. A.) 2 F.(2d) 530; Detroit Motor Appliance Co. v. Burke (D. C.) 4 F.(2d) 118; Galvin Electric Mfg. Co. v. Emerson Electric Mfg. Co. (C. C. A.) 19 F.(2d) 885; Scovill Mfg. Co. v. Satler (D. C.) 21 F.(2d) 630; Sanitary Refrigerator Co. v. Winters et al., 280 U. S. 30, 50 S. Ct. 9, 74 L. Ed. 147.

Much is claimed for the Caesar patent by reason of its commercial success. This court and others have pointed to the danger in accepting commercial success as a safe criterion of patentable novelty.

In Apple v. American Shoe Machinery & Tool Co. (C. C. A.) 232 F. 603, where a patent for an improved leather skiving machine was at issue, the court in holding there was no patentable novelty pointed out that the making of many sales was an unsafe criterion of patentable invention.

In Western Willite Co. v. Trinidad Asphalt Co., 16 F.(2d) 446, 450, this court said: "The extent to which a patented device has gone into use is not always a safe criterion, even of its actual utility."

In McClain v. Ortmayer, 141 U. S. 419, 429, 12 S. Ct. 76, 79, 35 L. Ed. 800, the court said: "While this court has held in a number of cases, even so late as Magowan v. New York Belting & Packing Co. [ante, 141 U. S. 332], 12 S. Ct. 71 [35 L. Ed. 781], (decided at the present term), that in a doubtful case the fact that a patented article had gone into general use is evidence of its utility, it is not conclusive even of that, much less of its patentable novelty."

In International Flatstub Check Book Co., Inc., v. Young & Selden Co. of Baltimore City (C. C. A.) 284 F. 831, 832, the court said: "Commercial success is persuasive in doubtful cases, and the more doubtful the case in other respects the more persuasive it becomes * * * but success may be due to advertisement or other causes. It is not always possible to find the reason why a thing may at one time receive no attention and at another be quickly and generally adopted in the trade or art. Especially in minor patents those engaged in the trade or art often prefer to pay the license fee rather than go to the expense and trouble of contesting a doubtful patent."

In Harvey Hubbell, Inc., v. General Electric Co. (C. C. A.) 267 F. 564: The court holds that commercial success of the patented device due to a large increase in the demand for the same and to extensive advertising based largely on claims of excellence not due to the patented invention is not to be considered as evidence of invention.

Butler Bros. v. Pratt (C. C. A.) 253 F. 654, 656: "The presumptions from the issuance of the patent and from the commercial success in the sale of plaintiff's bracelet links are not sufficient to overbear the manifest equivalency of functions between the two patents, and the extent of sales is more directly traceable to the unique advertising the article has received * * * than to any patentable novelty."

In Duer v. Corbin Cabinet Lock Co., 149 U. S. 216, 223, 13 S. Ct. 850, 854, 37 L. Ed. 707: "But there are so many other considerations than that of novelty entering into a question of this kind that the popularity of the article becomes an unsafe criterion." The court refers to catching the eye of the people by alluring trade marks, or by attractive appearance or "the more perfect finish of the article," extensive advertising, discounts in price, "or greater energy in pushing sales."

Krementz v. S. Cottle Co., 148 U. S. 556, 560, 13 S. Ct. 719, 721, 37 L. Ed. 558: This is the case of a patent issued to cover a collar button made of one piece of metal. The court says: "The argument drawn from the commercial success of a patented article is not always to be relied on. Other causes, such as the enterprise of the vendors, and the resort to lavish expenditures in advertising, may co-operate to promote a large marketable demand."

Acme Foundry & Machine Co. v. Oil Well Improvements Co. (C. C. A.) 2 F.(2d) 530, 531: Here the presumption arising from the grant of a patent is discussed and the effect of the device falling into almost universal use. That the fact of the issuance of a patent and its reception by popular acclaim to be deduced from great commercial success weigh in favor of validity when validity is questioned. The court says: "Neither of these things, nor both of them together are

conclusive; but in case of doubt, and where the proof of lack of novelty is not clear and convincing, they are to be considered as making for validity in resolving the doubt."

Walker on Patents (6th Ed.) vol. 1, pp. 101, 102, says: "But the fact that a machine or other article has been forced into extensive sale, by judicious advertising and business energy, or by reason of the fact that it is made more cheaply than before, or the fact that the patented invention constitutes only a part of the complete device, or by reason of some statutes or ordinances, will usually be sufficient to offset the showing made by the extensive use."

It is evident that the courts view with considerable caution evidences of commercial success as establishing patentable novelty. In this age of advertising and propaganda nearly anything can have its day of success in the market if large amounts are spent in advertising it. Proprietary medicines, claimed new methods of curing diseases, reducing machines, et cetera, have achieved wide success by skillful advertising. Over $100,000 was spent in three years advertising the Tropic-Aire Heater in standard periodicals, such as the Saturday Evening Post, as well as on billboards, and in circulars distributed for mailing to automobile owners. Caesar himself was an executive officer in a large motorbus company, which enabled him to secure their use in many busses. The Caesar heater was efficient and attractive. All of these things contributed to commercial success. Undoubtedly licensing was stimulated by the decision of the court in the Jumper Case, supra. Some of the correspondence shows that appellant called attention to the Jumper Case to those who were contemplating putting a hot water heater on the market. Commercial success, however, cannot supply inventive genius to a device that has none. Ability to sell is not inventive genius. R. H. Buhrke Co. v. Brauer Bros. Mfg. Co. (C. C. A.) 33 F.(2d) 838.

As the question of invention in claims 6 and 7 is not in our judgment a doubtful one, there is no presumption of invention from the extensive use of the Caesar patent. If there is no invention, utility is of course unimportant. To sustain a patent the device must not only be useful but a result of inventive genius. While a patentee is entitled to father the child of his brain, he is not entitled to a monopoly under patent protection for every slight change in the use of a patented article or to revive a patent monopoly that has passed over to public use. Here

months before the original Caesar patent was granted the Modine heater was used as the HaDees heater in automobiles. It had achieved enough commercial success to warrant appellant in starting suit for infringement of the Caesar patent. The public, therefore, was using the Modine heater in automobiles before claim 7 of Caesar was filed. The public would appear, therefore, to have some intervening rights which should not be appropriated by a patentee. Chicago & N. W. R. Co. v. Sayles, 97 U. S. 554, 24 L. Ed. 1053.

Applying the tests laid down in the various cases, we cannot but conclude that Caesar's device does not meet the necessary tests of invention. It is the result merely of applying mechanical skill to an old device to produce a new result. It performed the same function in a new place. This is not invention. All that Caesar did was, as stated by the trial court, "to point out that an old method of heating compartments was admirably adapted to heating the compartment of an automobile." If the question were one only of infringement we might have doubt as to whether the device of appellee did not come within the range of equivalents, narrow as that range must be under the limitations of the patent, but as to the broader question of invention in claims 6 and 7 we are not in doubt, and the suit should have been dismissed for want of equity.

Affirmed.

BOOTH, Circuit Judge (dissenting).

It is with reluctance and misgiving that I find myself unable to concur in the result reached in the able and exhaustive opinion of the majority of the court. The disagreement, as I view it, is confined solely to the question of evaluating what Mr. Caesar, the patentee of the patent in suit, did in producing his apparatus, the Tropic-Aire heater. In the view of the majority, invention was not involved; to me it seems that it was, and I shall state my position very briefly. Extended argument would serve no useful purpose.

Minimizing to the utmost limit what Mr. Caesar did, and assuming that all that he did was to select from the prior art a compact heating unit, install it in an automobile, and connect it by suitable pipes to the water cooling system of the gasoline engine, yet, I am not prepared to say that the resulting apparatus did not evince invention. It is contended that the bringing together this combination would occur to an ordinary mechanic. The conclusive answer, it seems to me,

to this contention, is that it did not occur to any one of the thousands of mechanics in the automobile industry or to any one of the thousands of mechanics in the heating industry. It did not occur to any one of the scores of skilled inventors in either of those lines of industry. But it did occur to Mr. Caesar.

The Ilg heating unit (Frank patent) had been known and in use since 1919. The Modine Unit heater came into use prior to 1925. The principal difference between these two units was in the type of radiator core used. The Sturtevant apparatus, which may be placed in the same class, was patented in 1869. As far back as 1915, at least, the problem of heating automobiles satisfactorily had become acute. Various heaters had been devised. A number of different types were in use during the period 1915–1926; among them, the exhaust gas heater, the manifold heater, the forced draft heater. No one of them was satisfactory. The need for a better type was widespread, and growing. Unsuccessful attempts had been made to produce hot water heaters for automobiles. Inventors for years had been and were still at work on the problem.

In 1926, Mr. Caesar made his selection of old elements from the prior art, formed his combination apparatus, and embodied it in the Tropic-Aire heater. The elements were old, but the combination was new. This new heater possessed great utility; it solved the problem which had been long standing. This new heater met with general approval, and achieved a very great commercial success.

The courts have been careful not to give a hard and fast definition of invention. They have, however, indicated a number of elements that enter into the concept. It appears to be conceded that the Tropic-Aire heater discloses all of the elements of invention except one; but it seems to be held that the thought which picked out of the prior art the proper elements to make the combination and which put them together to make the apparatus, was the thought of a mechanic and not the thought of an inventor.

It seems to me that the majority of the court in its careful consideration of the various matters involved has not given sufficient weight to the problem that confronted the men who were seeking a successful heater for automobiles, and to the conditions and limitations which were attached to the problem, among them, the many different models of automobiles, the need for a heater that would

suit all models, the limitation of size, the elimination of the introduction of noxious gases into the automobile. It seems to me further that sufficient weight has not been given to the length of time this problem had existed, notwithstanding the widespread and growing need, and notwithstanding the fact that the problem was being carefully studied by men skilled in the art. Finally, it seems to me that sufficient weight has not been given to the facts that the Tropic-Aire heater solved the problem completely and satisfactorily; that it was enthusiastically received, and has gained great commercial success; and that it has received the homage of numerous imitators, including the HaDees heater, and defendant's heater, Mephisto.

I do not overlook the fact that the elements of the new heater were all old and found ready at hand, subject to minor changes; but they had been ready at hand for years while the problem remained unsolved. Mr. Caesar picked these elements out, put them together, and solved the problem. Under all the circumstances disclosed, I cannot rid myself of the conviction that his full comprehension of the problem and his clear perception of what combination of elements would solve it, followed by the embodiment of both ideas in the successful apparatus, involved invention within the true meaning of that term.

An array of authorities might be given in support of the foregoing views. One is sufficient to illustrate my position. In Inland Mfg. Co. v. American Wood Rim Co. (C. C. A.) 14 F.(2d) 657, the court said at page 659:

"It is no argument against invention that the inventor availed himself of all knowledge known to mechanics skilled in the art, nor is it surprising that, when a definite result has been accomplished, the simplicity of the methods by which it is accomplished would seem to be obvious. The line between the skilled mechanic and the ingenuity of the inventor cannot be accurately drawn in any given case, but where a demand has long existed, and men skilled in the art have sought to meet that demand without success, the argument that the methods employed by the inventor who has solved the problem are so obvious as to involve only mechanical skill, is not entitled to very serious consideration."

In my opinion the patent should be held valid, and infringed by defendant's apparatus.